UNITED STATES of America ex rel.
John SUGGS, Petitioner,

v.

J. Edwin LaVALLEE, Superintendent, Clinton State Correctional Facility, Dannemora, New York, Respondent.

No. 72 Civ. 4336.

United States District Court,
S. D. New York.

April 5, 1977.

See also D.C., 400 F.Supp. 1366.

Judson A. Parsons, Jr., Summit, N.J., for petitioner by Christopher Kende, New York City, of counsel.

Robert M. Morgenthau, Dist. Atty., New York County, New York City, for respondent by Henry Steinglass, Robert Seewald, Asst. Dist. Attys., New York City, of counsel.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge.

After a long and somewhat tortured history of judicial consideration, this habeas corpus proceeding has culminated in an evidentiary hearing on the issue of petitioner Suggs' competence at the time he entered guilty pleas to one count each of rape and robbery in state court. Both the circumstances of Suggs' incarceration and the procedural route taken by his petition are detailed in my opinions of February 25, 1975, 390 F.Supp. 383 (S.D.N.Y.1975), September 3, 1975, 400 F.Supp. 1366 (S.D.N.Y.1975), and November 16, 1976, 422 F.Supp. 1042 (S.D.N.Y.1976), and in the opinion of the Court of Appeals of August 7, 1975, 523 F.2d 539 (2d Cir. 1975).

Simply stated, Suggs was convicted and sentenced to concurrent five to fifteen year terms of imprisonment on the basis of guilty pleas entered before Justice Nunez of the State Supreme Court, New York County, on September 13, 1968. Immediately following the acceptance of the pleas, as a result of post-plea statements made by Suggs, Justice Nunez ordered Suggs to Bellevue Psychiatric Hospital for a psychiatric examination and report. This report, dated October 21, 1968, and prepared by Drs. Martin I. Lubin and Laszlo Kadar, diagnosed Suggs as a paranoid type schizophrenic, "in such a state of insanity as to be incapable of understanding the charge, proceedings or making his defense."

On November 6, 1968, on the basis of this report, and with the consent of the parties, Justice Gold committed Suggs to Matteawan State Hospital for the Criminally Insane, where petitioner remained until he was declared competent on April 4, 1969. On June 6, 1969, sentence was imposed by Justice Schweitzer based solely on the petitioner's guilty plea of September 13, 1968.

After Suggs attempted various unsuccessful challenges to his conviction through state appellate and postconviction proceedings, I granted federal habeas corpus relief, directing that the guilty pleas be reopened or reaffirmed before sentence could be imposed. On the basis of the record before me, I determined that Suggs was incompetent at the time of his pleas, which condition rendered the pleas void; that any attempted ratification of the pleas at sentencing failed, and that no effective waiver of rights occurred at sentencing as a result of an inadequate inquiry into the voluntariness of the pleas under *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), decided four days before Suggs was sentenced.

After the State respondent filed its notice of appeal from my order, two psychiatric reports dated July 23, 1968 and May 20, 1969 were discovered in the dead records

file of the State Supreme Court's Psychiatric Clinic. These reports, prepared by Dr. Emanuel Messinger, stated that Suggs was not psychotic, thereby flatly contradicting the only psychiatric report theretofore in the record. In light of these eleventh hour reports, the Court of Appeals remanded the case for an evidentiary hearing,[1] leaving the forum to my discretion. For the convenience of the Justices of the State Supreme Court, whose testimony was essential, I requested that the hearing be held in state court. However, for reasons detailed in my opinion of November 16, 1976, 422 F.Supp. 1042, the determination of Justice Melia, before whom testimony was taken, was set aside and a federal evidentiary hearing was ordered and subsequently held before me, on the issue of Suggs' competence at the time his guilty pleas were taken. This opinion constitutes my findings of fact and conclusions of law on the issue pursuant to Rule 52(a), F.R.Civ.P.

My consideration of the weight to be accorded the Messinger reports in determining Suggs' competency on September 13, 1968, the day of his guilty pleas, begins with the circumstances surrounding their preparation. On July 15, 1968, after petitioner had been arrested and was being held in custody, the Probation Department in the Youthful Offender Part of the State Supreme Court, New York County, requested that Court's Psychiatric Clinic to conduct a preliminary examination of Suggs. Apparently, this was done as part of a routine pre-pleading investigation of defendants such as Suggs, then 17 years old, to determine whether youthful offender treatment would be appropriate.[2] It was pursuant to

this request that Dr. Emanuel Messinger, the psychiatrist-in-charge, examined petitioner and prepared the written report of July 23, 1968, stating that petitioner was "without psychosis" and describing Suggs' personality classification "as that of the Pathologic Personality Group, Emotionally Unstable Type, with depressive and paranoid trends." The report also quoted from the following notation, among others, of Dr. Suessmilch, the psychologist who tested Suggs:

> Although this defendant refused to cooperate on most of the Rorschack, such projective material as we have does not suggest a true thinking disorder, nor a psychosis. He impresses us as wilful, defensive, hostile, negativistic, paranoid and antisocial. We would classify him as a narcissistic behavior disorder of extreme degree. A poor prognosis is quite likely.

The usual procedure at that time was for copies of such psychiatric reports to be sent to the Probation Department and to the court. However, the plea minutes indicate that when Justice Nunez inquired whether Suggs had undergone a psychiatric examination, the court clerk replied that there was no record indicating so.[3]

It is clear that, despite Suggs' assertion at the plea hearing that he was examined "right downstairs," Justice Nunez was unaware of the Messinger report.[4] Donald Tucker, petitioner's assigned counsel, was likewise uninformed of the examination and report. Even though the testimony indicated that copies of such reports were not usually sent to defense counsel, John Collins, the Assistant District Attorney han-

---

1. Because of the remand, the Court of Appeals found it unnecessary to address the ratification and *Boykin* issues. My inquiry at this juncture is limited to Suggs' competency at the time of the pleas; the remaining issues are fully explored in 390 F.Supp. at 388–89.

2. Petitioner was subsequently disapproved for Youthful Offender Status by Justice Tierney.

3. Nor, apparently, was there an inclusion in the record of the May 20, 1969 report of Dr. Messinger, on the basis of which, petitioner was returned to the court for sentencing. This re-

port contained the same diagnosis as the July report.

4. Justice Sandifer, who denied petitioner's second *coram nobis* petition which raised the issue of competency at the time of the pleas, was likewise unaware of the Messinger reports. Justice Gold, upon whose order Suggs was committed to Matteawan in November 1968, has testified by stipulation that he has no recollection of petitioner nor of any proceeding concerning petitioner.

dling Suggs' pleas, testified before Justice Melia that consent of the defendant and counsel would have to be obtained before such an examination could proceed. Nothing in the record indicates that this procedure was followed.

Mr. Tucker further testified that had he been aware of the fact that there had been such an examination, notwithstanding Dr. Messinger's determination, he would have asked for a further examination of petitioner, even if Justice Nunez had not done so. Mr. Tucker had no personal recollection of petitioner, but he testified before me that if he had interviewed a defendant and felt that he was "not in some way psychiatrically competent," he would put a notation in his file and request a psychiatric examination. The file is devoid of any such indication; [5] to the contrary, the file contained a statement signed by petitioner, written in Mr. Tucker's handwriting except for signature, admitting petitioner's guilt. Mr. Tucker testified that this was done because Suggs was "adamant about taking the plea, wanted to take the plea, demanded to take the plea," and Mr. Tucker wanted to protect himself.

Although neither Mr. Tucker, nor Mr. Collins, who, it must be noted, saw petitioner only on the occasion of the plea hearing, noted anything unusual about petitioner's behavior, the contrary was true of Justice Nunez. Justice Nunez testified by stipulation that had he been aware of the Messinger report of July 23, 1968, he still might have ordered the Bellevue examination since "[t]he defendant's answers were unusual. The Messinger report was only a preliminary report . . . [It] said that the defendant was without psychosis and did not speak to the issue of whether he was competent to be tried." Indeed, Justice Nunez ordered the Bellevue examination not just in aid of sentencing but "for all purposes, including a determination of whether defendant was competent to be tried." Justice Nunez was the only witness who had an independent recollection of Suggs. He recalled the plea "because of the unexpected answer the defendant gave to his question following the plea."

An examination of the plea minutes reveals that Suggs' responses to post-plea questions posed by Justice Nunez were indeed unusual. Justice Nunez previously had asked Suggs if he was sorry for his acts, and Suggs replied that he was not. After the pleas were taken, Justice Nunez again referred to Suggs' lack of remorse, to which Suggs gave the most unusual reply that he had tried being sorry once and had lost a finger as a result.

The Court: You are not sorry at all that you did any of these things, Mr. Suggs?

The Defendant: Nothing to be sorry about.

The Court: What?

The Defendant: There is nothing to be sorry about.

The Court: Nothing to be sorry about? Well, what in your opinion would be something to be sorry about? If you did what? If what happened?

The Defendant: If I did something and I did it there is nothing to be sorry about after I do it.

The Court: No matter what you do?

The Defendant: No matter what I do.

.    .    .    .    .

The Court: Well, don't you think it might help you if you show that you are sorry, you show compassion for your victims?

The Defendant: I tried that once.

The Court: What?

The Defendant: I tried that once.

The Court: You tried that once? When was that?

The Defendant: When I was small.

The Court: What happened when you were small?

The Defendant: I lost a finger because I tried.

---

5. Mr. Tucker was on the staff of Legal Aid which had fractional representation. He did not represent Suggs at any stage other than at the pleas.

The Court: You lost a finger you say?

The Defendant: Part of it.

The Court: What happened then?

The defendant: That's when I did something when I had a fight with my sister. I wanted to show my mother I was sorry. Instead of showing her I was sorry, she cut me.

The Court: Who tried to cut you, your mother or your sister?

The Defendant: My mother.

.     .     .     .     .

The Court: We are going to have the doctors look at you, Mr. Suggs. They may be able to help you in some way because there is something wrong with you, apparently. You seem to be—whom are you mad at?

The Defendant: No one.

(plea minutes pp. 17–21).

Petitioner is, indeed, missing the top portion of his left pinky finger. Dr. Augustus Kinzel, a psychiatrist of impressive qualification, who examined petitioner in connection with this hearing and who, based on prior psychiatric reports and the record of prior proceedings concerning petitioner, offered expert testimony on petitioner's behalf, testified that in his opinion, Suggs' reference to his mother cutting off his finger was a "confabulation" or "loose association" indicative of psychosis, and the story had no basis in fact. According to Dr. Kinzel, based on his interview with petitioner, the accurate version was that petitioner as a child had caught his finger in the chains of a swing; the chains pinched the finger which had to be amputated as a result. This version of those events is supported by statements contained in a clinical summary of petitioner's stay at Rockland State Hospital from August 1963 to January 1965. In the discussion of petitioner's personal history, the supervising psychiatrist stated: "At the age of 4 the first joint of [petitioner's] little finger was crushed and had to be amputated," and it is noted further:

"*Traumatic Factors*: At the age of four the patient had an amputation of the first joint of his little finger because of a crushing injury . . . ."

Petitioner's stay at Rockland State Hospital was but one period in a life lived basically in reformatory-type and other institutions since approximately 1961. The psychiatric reports in evidence demonstrate a history of maladjustment and instability, characterized by one suicide attempt while at the Wiltwyck School for Boys sometime after the death of Suggs' mother in the early 1960's, and another while Suggs was incarcerated in the Brooklyn House of Detention in August, 1968. It is of note that Dr. Messinger's first report was prepared prior to this August 1968 incident. Also of note are the records of a prior stay at Bellevue Psychiatric Hospital from July 28, 1965 to August 18, 1965, when petitioner was 14 years old. He was there diagnosed as having a "character disorder [with] paranoid and borderline features," and was referred to as a "passive aggressive type" with a "potential for schizophrenia." Another report of August 14, 1965 indicates that although the interviewer did not consider Suggs a psychotic youngster as yet, "there is a strong possibility . . . that he may develop into a paranoid schizo[phrenic] in the future."

Before proceeding with the psychiatric testimony offered by Drs. Lubin, Kadar and Messinger before Justice Melia, as well as that of Dr. Kinzel, a crucial report must be detailed. In connection with the preparation of the Lubin-Kadar report of October 21, 1968, several drafts were prepared. The first of these was dictated on September 19, 1968, only six days after the pleas. This draft states that petitioner was able to describe the details of the crimes charged in "an adequate manner," and that he "could be competent with the help of vigorous defense counsel." Dr. Lubin's impression at that time was that Suggs was "Schizoid with Paranoid Features."

Dr. Lubin testified that his conclusion at that time was that petitioner was incompetent, notwithstanding the possibility that if Suggs were a borderline case he might have been aided to a state of cooperation where

he then might be considered competent. This tentative conclusion of incompetency was confirmed by the impression contained in Dr. Lubin's later notes of September 2, 1965 indicating that petitioner suffered from "Schizophrenia, Paranoid Type."

Dr. Lubin, after demonstrating his total familiarity with the standards for determining competence, testified that at no time during his interviews with petitioner was petitioner able to meet the criteria for competency; that petitioner could not fully appreciate the consequences of his position nor cooperate in his defense. He did indicate that competency is a relative matter, and petitioner may have been more or less competent on particular occasions. Dr. Lubin additionally considered the possibility that petitioner may have wanted to promote the appearance of incompetency in order to escape responsibility, but he concluded that, despite any desire on petitioner's part to feign such a state, petitioner was predisposed to a mental disorder which, under the pressures of the circumstances, caused him to have a "reactive psychosis," i. e., to operate at a psychotic level of judgment. This particular testimony is supported by a clinical summary prepared on December 18, 1968, at Matteawan, which indicates that petitioner stated, among other things, that he "put on an act while at Bellevue in order to be sent to a hospital" in contradiction to a later statement that his lawyer "sent him to a hospital to get rid of him." Despite this initial "admission" of prevarication, petitioner was diagnosed at Matteawan as suffering from a "psychosis with antisocial personality, paranoid and reactive features."

Dr. Kadar testified that it was his opinion that petitioner was incompetent on October 21, 1968, the date that he and Dr. Lubin jointly interviewed Suggs, but that Suggs could have been experiencing a psychotic episode of unknown duration. If so, petitioner could have been competent at the time of Dr. Messinger's July report. Indeed, Dr. Kadar further testified that petitioner's unstable, depressive and paranoid condition diagnosed by Dr. Messinger in July 1968, could have deteriorated into the psychotic condition reflected in the October 1968 report. Dr. Lubin's testimony comports with this possibility of petitioner's being competent in July.

Dr. Messinger likewise conceded the possibility of Suggs' experiencing psychotic episodes. Although, as Justice Nunez pointed out, the Messinger report did not, on its face, speak to the issue of competence, Dr. Messinger testified that based on his examination, Suggs was competent on July 23, 1968. However, he further testified that "people who are found competent on one day can become psychotic or incompetent at another time at a later date and they can recover," and that his report was not inconsistent with the Lubin-Kadar report of October 21, 1968 finding Suggs incompetent. Indeed, Dr. Messinger's second report of May 20, 1969 indicates that, subsequent to his first report, petitioner "had a disturbed episode sufficient to have him committed to Matteawan where he remained some five and a half months . . . ."

Moreover, the possibility that Suggs could have been experiencing psychotic episodes even during the period in July 1968 that he was undergoing examination at the Supreme Court Psychiatric Clinic was conceded by Dr. Messinger. Since the psychiatric clinic operated on an out-patient basis, unlike Bellevue which provided continuous observation, Dr. Messinger testified that Suggs could have been short psychotic episodes and "it is not likely that I would know about it" if not manifested in aggressive or other behavior particularly noticeable to the prison authorities.

Dr. Kinzel testified that based on the record, his interview with petitioner, and his expertise, that it was his opinion that petitioner was, in fact, a paranoid schizophrenic and incompetent on September 13, 1968, the day of the pleas. This testimony constitutes the only psychiatric opinion focused directly on the day in question. Dr. Kinzel, like Drs. Messinger, Lubin and Kadar, opined that petitioner had experienced a psychotic episode which he emerged from at Matteawan. It was Dr. Kinzel's impres-

sion, however, that the signs interpreted by Dr. Messinger as exhibiting a personality disorder could actually have described a psychosis. This testimony is not inconsistent with Dr. Kadar's view that petitioner's condition as reported by Dr. Messinger deteriorated into a psychotic state.

Dr. Kinzel additionally addressed the substance of the plea minutes which evidenced that petitioner, in response to extensive questioning by the court, described in some detail the circumstances of two of the crimes charged, and, when asked the reason for his acts, petitioner replied as follows:

The Court: This lady that you raped on May 24th didn't have anything to do with the rape of your sister, did she?

The Defendant: No, sir.

The Court: Why did you attack her?

The Defendant: I just had it in mind.

The Court: You just had it in mind?

The Defendant: Yes, sir.

The Court: About how old a person was this lady?

The Defendant: About thirty-six.

.    .    .    .    .

The Court: How old a lady was she, about?

The Defendant: About thirty-nine, forty.

The Court: About thirty-nine or forty. Why did you steal the money from her.

The Defendant: I just wanted to steal it.

The Court: What?

The Defendant: I just wanted to steal it.

(plea minutes, pp. 12–14)

It was Dr. Kinzel's view that petitioner's responses demonstrated a "psychotic lack of judgment;" that is, no serious awareness of the import of the colloquy and necessity for offering a defense. Dr. Kinzel testified that in petitioner's non-psychotic state, he has "relevant normal consciousness"; when psychotic "he does just what thought comes into his head." This observation is obviously reflected in the plea minutes. Additionally, Dr. Kinzel stated that since persons in psychotic states often can recount their acts quite literally and factually while lacking an understanding of the same, petitioner's detailed report of the crimes was entirely consistent with a psychotic state.

It was petitioner's ability to relate the facts, as well as his adamant desire to plead, that led Mr. Tucker, petitioner's counsel, to believe that petitioner understood the proceedings and could adequately assist in his defense. However, as Dr. Kinzel pointed out, it is not uncommon for a non-psychiatrist, even an experienced defense lawyer, to overlook incompetency, particularly when manifested by what appears to be a capacity to discuss the crimes. Nor, in Dr. Kinzel's view, was petitioner's obstinate resolve to plead inconsistent with a psychosis.

While Mr. Tucker may not have found petitioner's responses indicating a total lack of concern and Suggs' obscure and sudden reference to his losing a finger as a child as a result of his mother's act unusual, it was apparently a strange enough response for Justice Nunez to recall the incident, as well as petitioner himself, some eight years after the pleas, and to cause Justice Nunez to send petitioner at the time to Bellevue to be examined "for all purposes," even though the court was advised by Suggs at the plea hearing that an examination had already been conducted "right downstairs."

Weighing all the evidence, the conclusion is inescapable that petitioner was incompetent on September 13, 1968. Although Dr. Messinger indicated that petitioner was competent on July 23, 1968, that report was prepared some seven weeks before the pleas were entered, and as reflected in the May 20, 1969 report, Dr. Messinger acknowledged petitioner's psychotic condition which prompted the Matteawan commitment. He also conceded the possibility that petitioner may have been experiencing a psychotic episode even at the time the July examination was being conducted. The only other indicia of competence is Mr. Tucker's testimony and, al-

though an attorney's opinion as to his client's ability to understand the nature of the proceedings and to cooperate in his defense is significant, *United States ex rel. Roth v. Zelker,* 455 F.2d 1105, 1108 (2d Cir.), *cert. denied,* 408 U.S. 927, 92 S.Ct. 2512, 33 L.Ed.2d 340 (1972), it is by no means controlling, especially in light of Justice Nunez's observation and reaction with which, based on my reading of the plea minutes, I agree. Dr. Kinzel's testimony relating to the account of petitioner's loss of a portion of his finger, and the indications that the finger was crushed and then amputated, rather than chopped off by Suggs' mother, as recalled by petitioner, bolsters my conclusion in this regard.

Furthermore, the above, coupled with the fact that petitioner was found to be incompetent by Dr. Lubin only six days after the plea, which conclusion was confirmed and corroborated by Dr. Kadar some four weeks later, and that on the basis of the Lubin-Kadar report, without objection by the respondent, petitioner was committed to Matteawan, substantially negates any other conclusion but that petitioner was indeed incompetent at the time of the pleas.

Since the pleas, taken when Suggs was incompetent must be regarded as null and void, *McCarthy v. United States,* 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969); *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), petitioner's guilty pleas are vacated and the writ of habeas corpus shall issue sixty days from the date of the filing of this opinion, unless within that time petitioner is allowed to replead to the indictment in state court.

It appears, however, that on the basis of communications I received from petitioner following the hearing, that petitioner may be exhibiting the same symptoms which gave rise to his original commitment to Matteawan; i. e., a belief of persecution by the prison authorities and fear for his life, and periods of blackouts. It thus may be appropriate that the state court consider causing petitioner to be examined once again as to his mental competency at this time.

I again wish to express the Court's appreciation to Judson A. Parsons, Jr., Esq. and Christopher Kende, Esq. for their assistance in this case.

SO ORDERED.