John SUGGS, Appellee,

v.

J. Edwin LaVALLEE, Superintendent, Clinton State Correctional Institution, Appellant.

No. 137, Docket 77-2053.

United States Court of Appeals, Second Circuit.

Argued Sept. 2, 1977.

Decided Jan. 27, 1978.

Henry J. Steinglass, Asst. Dist. Atty., New York County, New York City (Robert M. Morgenthau, Dist. Atty., New York County, Peter L. Zimroth, Asst. Dist. Atty., New York City, of counsel), for appellant.

Judson A. Parson, Jr., New York City (Christopher B. Kende, New York City, of counsel), for appellee.

Before KAUFMAN, Chief Judge, and OAKES and MESKILL, Circuit Judges.

OAKES, Circuit Judge:

This case presents an all too familiar pattern of breakdown—of societal, institutional, medical and legal failure adequately to cope with a person. Perhaps inability to solve an insoluble problem is a better description, since the intentions of those attempting to cope—psychiatrists, psychologists, correction officers, judges and lawyers—have in no case been untoward.

The John Suggses of life begin with an utterly crippling home environment. Early on they exhibit signs of unusual, bizarre and even destructive behavior, often the result of traumatic experiences. Society, with humanitarian motivation, institutionalizes them, ostensibly to protect itself or them, more probably because no alternative exists. The depth of the mental/emotional problem proves too great, the number of Suggses too large, the resources for positive assistance too few. When released into society, criminal behavior is probable, not merely possible. A rape, a robbery, a mugging or worse ensues.

The legal system then assumes jurisdiction over the problem. Somehow the rights of the individual must be protected, while the danger to society is removed. Questions of competency to stand trial and of criminal responsibility arise. The psychiatric experts and the judges who must rule disagree; both psychiatry and law are insufficiently advanced to attain the scientific precision necessary to resolve these questions. Yet decisions have to be made. After a period of years the case is just as insoluble as it was in the beginning.

The posture of John Suggs' case before us may be rather briefly stated. Its history is more complex. Its psychiatric background is extensive. Its resolution is, as one might suspect, hardly free from doubt.

## I. POSTURE

The People of the State of New York appeal from a judgment of the United States District Court for the Southern District of New York, Kevin Thomas Duffy, Judge, vacating Suggs' convictions for rape and robbery and granting a writ of habeas corpus to issue within sixty days unless Suggs is permitted to replead in state court[1] on the basis that Suggs was never afforded the colloquy on voluntariness mandated by *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), at a time when he was competent to stand trial. 430 F.Supp. 877, 884 (S.D.N.Y.1977); 390 F.Supp. 383 (S.D.N.Y.), *vacated on other grounds,* 523 F.2d 539 (2d Cir. 1975). The judgment was rendered after an evidentiary hearing in which Judge Duffy found Suggs incompetent at the time of his guilty pleas. 430 F.Supp. 877.

To consider the State's contentions adequately requires a detailed recounting of both the ten years of litigation preceding this appeal and the facts underlying this protracted judicial history. At the risk of some repetition, we first provide a skeletal, chronological summary of the prior state and federal proceedings with the goal of minimizing the confusion wrought by the complex and lengthy record.

After Suggs' arrest, he was psychiatrically examined by Dr. Emanuel Messinger in July, 1968, to aid in determining whether Suggs would be afforded Youthful Offender treatment. This report, which arguably found Suggs competent to stand trial, was lost. Thus, as subsequently revealed, none of the state judges who considered this case was aware of these psychiatric conclusions.

On September 13, 1968, Justice Emilio Nunez of the State Supreme Court, New York County, accepted Suggs' pleas of guilty to one count of rape and one count of robbery after a discussion with Suggs which evidently satisfied the judge of the pleas' voluntariness. As the colloquy continued, however, appellee's unusual responses prompted the court, sua sponte, to order a psychiatric examination. However, the court did not reject or otherwise mention the pleas of guilty accepted immediately preceding the commitment order. The parties differ on whether Justice Nunez ordered the examination solely for purposes of sentencing, or to determine competency as well.

A second group of psychiatric examinations performed by Drs. Martin Lubin and Laszlo Kadar between September 19 and October 21, 1968, at Bellevue Psychiatric Hospital (Bellevue), pursuant to Justice Nunez' order, found Suggs incompetent to stand trial. On the basis of these reports, and without knowledge of the Messinger report, appellee was determined incompetent by Justice Samuel Gold on November 6, 1968, and was committed until competent to Matteawan State Hospital (Matteawan) on November 15, 1968.

When the authorities determined that appellee could stand trial, he was returned to Justice Mitchell Schweitzer, who required a second examination by Dr. Messinger, performed in May, 1969. This report substantially corroborated the earlier Messinger diagnosis and was also misplaced after the proceeding before Justice Schweitzer. Justice Schweitzer then certified Suggs as competent, and sentenced him on June 6, 1969, on the basis of his previous pleas of guilty before Justice Nunez without inquiring into the validity of or factual basis for the earlier pleas. The sentence was imposed after Suggs personally informed the court that while he did not wish to withdraw his previous pleas of guilty, and wished to accept sentence on those pleas, he felt that he had been incompetent when he originally pleaded guilty. A series of state appeals and state collateral attacks followed, which are not particularly important in resolving this appeal.

On February 25, 1975, Judge Duffy granted appellee's petition for a writ of

---

1. A stay was granted pending this appeal.

habeas corpus without an evidentiary hearing. He concluded that Suggs was denied due process of law because the state courts had never conducted a full and complete inquiry into voluntariness, as required by *Boykin v. Alabama, supra,* decided four days prior to the sentencing hearing before Justice Schweitzer. The district court first found Suggs incompetent when he entered his pleas of guilty on September 13, 1968, as judicially determined by Justice Gold. Thus the pleas were void under *McCarthy v. United States,* 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969), and *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). It then held that the 1969 sentencing by Justice Schweitzer was not a valid substitute for a guilty plea because no *Boykin* colloquy had been conducted at this later time. 390 F.Supp. 383.

During the pendency of the State's appeal from Judge Duffy's decision, the two Messinger reports were discovered. We vacated Judge Duffy's order and remanded the case for an evidentiary hearing by either the state court or the district court on Suggs' competence at the time the guilty pleas were entered, in light of the newly discovered Messinger reports which contradicted the Lubin/Kadar reports. We left to Judge Duffy's discretion whether he or the state court would conduct the hearing. *United States ex rel. Suggs v. LaVallee,* 523 F.2d 539, 543 (2d Cir. 1975).

On remand, Judge Duffy ordered that a factual hearing be held in state court for the convenience of the state judges who would be required to testify. 400 F.Supp. 1366 (S.D.N.Y.1975). The scope of this reference is in dispute.

A full-blown hearing on Suggs' competency was conducted by Justice Anthony Melia, in the Supreme Court, New York County, on November 17 and December 1, 1975. He found that Suggs was competent when he entered his pleas and that in any case, contrary to Judge Duffy's prior decision, 390 F.Supp. 383, Suggs had ratified the pleas at sentencing. *People v. Suggs,* Nos. 3063/68, 3063A/68, 2251/68 (N.Y. County Sup.Ct., filed Dec. 3, 1975).

Judge Duffy then set aside Justice Melia's findings and ordered a federal hearing on the issue of competency. 422 F.Supp. 1042 (S.D.N.Y.1976). He again found Suggs incompetent on September 13, 1968, and followed his earlier opinion, 390 F.Supp. 383, granting the writ, 430 F.Supp. 877.

This appeal followed.

The State contends first that Judge Duffy was bound by, or erred in not following, the decision of Justice Melia holding Suggs competent at the time of his guilty plea. The State contends second that, if Suggs was incompetent at the time of his September 13, 1968, plea, he abandoned or waived the incompetency claim at the sentencing proceeding when he was competent and is therefore precluded from raising it in the habeas corpus proceedings under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).[2] Finally, the State argues that appellee ratified the pleas at the time of sentencing by not withdrawing them when given the opportunity.[3]

The State does not contend that, if its arguments are insufficient, Judge Duffy's factual findings are clearly erroneous. However, in the course of addressing the State's arguments, which we believe cannot prevail, the validity of the district court's findings and decisions will become manifest. We begin with an in-depth recitation of the facts.

## II. HISTORY OF THE CASE

### A. *Suggs' Preindictment History*

1. Early Childhood History.

John Suggs evidently was born in New York in June of 1951, is black and has lived

---

2. The State argues further that even under the "deliberate by-pass" language of *Fay v. Noia,* 372 U.S. 391, 439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), the claim of incompetency at plea was abandoned.

3. This argument was presented to and rejected by Judge Duffy. 390 F.Supp. 383 (S.D.N.Y.), *vacated on other grounds,* 523 F.2d 539 (2d Cir. 1975). While it is unclear whether the State has abandoned the claim at this time, we will nevertheless address the issue.

in New York City all of his life. Much of his personal history is unclear in the lengthy but still incomplete record that ten years of legal proceedings have produced.[4] The record vividly reveals an unstable home environment, devoid of parental supervision and attention. From his birth appellee was shuttled back and forth between his mother[5] and his "aunt."[6]

Suggs was an habitual truant from school, usually riding subways or wandering in parks. In early childhood he exhibited unusual behavior. On several occasions he set fire to newspapers in the house, but ordinarily notified the fire department shortly after starting the blaze. His aunt also reported that he set fire to furniture in her home, and that he once killed a parakeet by pulling off the bird's head.

2. Institutionalization.

Suggs was referred to the Wiltwyck School for Boys (Wiltwyck) at the age of ten, originally by the Manhattan Children's Court on a delinquency petition following a burglary incident in which he was implicated. The petition was changed to a neglect petition after investigation uncovered the obvious parental neglect.

His behavior problems continued unabated. When his mother died about a month after his admission, Suggs evidently became obsessed with the idea that the children in his dormitory were responsible for her death. In retribution he set fire to the dormitory, but did so where it would be found and no one would be hurt. On another occasion he was found packing dirt into the exhaust of a truck used to transport the children with the aim of blowing it up. At some point he became convinced that he too was responsible for his mother's death. While still at Wiltwyck, approximately at the age of eleven, he attempted suicide by drinking mercury from a thermometer. According to the Wiltwyck records as subsequently set forth in the Rockland State Hospital (Rockland) files, Suggs' method of establishing friendship was to engage in assaultive conduct; there were numerous acts of hostility against other student-inmates as well as against teachers. The medical director, aware of the threat Suggs posed to himself and others, and unable to arrest Suggs' delusional thinking, finally suggested institutionalization at Rockland.

Suggs was admitted to Rockland in August of 1963. When he was initially examined by Dr. Katz, a psychiatrist, he appeared to have a normal intellectual level with orientation and memory intact. But Dr. Katz also noted Suggs' long history of auditory and visual hallucinations, his tendency toward obsessive, compulsive thinking with delusional and paranoid aspects and the severe impairment of Suggs' insight and judgment. The initial impression of the psychiatrist was that "[t]here is much of a schizophrenic about this youngster but

4. The following facts are stated with qualifications and conditionally. Most of them are drawn from sketchy records based on second-hand information, or facts furnished by Suggs, whose reliability for accurately conveying information is questionable.

5. She came from North Carolina and was unmarried at the time of his birth. She had other children—Suggs usually mentions two but has referred to as many as eight—who evidently were also illegitimate. Little else is known about his mother, except that she died in 1961 and was described by his "aunt" as "a person whose mind was like a child [*sic*]." It appears possible that Suggs' mother lived with his father for a short period of time after Suggs was born.

Parental neglect was apparent from the first. The aunt recalls seeing appellee on the floor of his mother's home eating a loaf of bread. On another occasion, Suggs, at three years of age, was found by the police wandering the streets after his mother sent him to the store to buy some cookies. At the age of three, he fell down a flight of stairs. This incident was followed by a history of headshaking and nocturnal nose-bleeding. At the age of four the first joint of his little finger was crushed, apparently in a swing, and had to be amputated. At approximately ten years of age, appellee contracted acute rheumatic fever with carditis.

6. Suggs lived with a friend of his mother's, referred to in the records as both his aunt and guardian, from approximately 1954 until he was admitted to the Wiltwyck School for Boys at ten years of age. While she tried to help, alcoholic and marital problems precluded her from giving Suggs the kind of upbringing expected of even remote foster parents.

he is extremely emotionally deprived and now unable to accept any close relationship, although he verbalizes a desire for it." He concluded that Suggs "may be ultimately a schizophrenic."

There was little change in Suggs' condition after admittance. Not long after he arrived at Rockland his ward was changed because he was fearful of attacks by other patients. He was later diagnosed as having "primary behavior disorders in children. Conduct disturbance."

At the age of thirteen, in 1964, he left Rockland for the Thanksgiving holiday but did not return. In January, 1965, he was found in New York City, and after a psychiatric examination was placed on convalescent status, so that he could reside with his aunt while attending a neighborhood clinic. He was discharged in November, 1965, when it was learned that Suggs was in "Warwick" Training School (Warwick).

Suggs may have been sent to Warwick for having shot or stabbed his aunt's husband. Incidental to this commitment, he was examined in July of 1965, this time at Bellevue, apparently pursuant to a Children's Court order on another neglect petition, and possibly because of his failure to attend the aftercare clinic when placed on convalescent status at Rockland. He was initially diagnosed, despite his "sunken, depressive attitude," as "not psychotic at present," though evidencing a strong tendency in that direction.[7] A later report by a psychologist, Ms. Barron, referred to Suggs as a "powderkeg about ready to explode," with feelings of "inadequacy, helplessness and depression." She accurately predicted that "under severe stress" he would "be unable to institute appropriate limits on his own behavior, and rage reactions are proba-

ble." She too felt that while "he functions superficially in a reasonable fashion," he is "at a borderline level of integration, and may regress rather rapidly under repeated tension or additional trauma." Her diagnostic impression was "character disorder with paranoid and borderline features (passive-aggressive-aggressive type)" with "potential for schizophrenia." Because of his emotional instability and deprived home environment, Bellevue recommended another stay at training school.

At this point the already unclear record becomes further muddied. It appears that when Suggs was released from Warwick to his aunt, he attended Charles Evans Hughes High School for four or five months. There his difficulties continued as he apparently "kidnapped" a schoolmate for a period of four hours. The authorities then sent him to Hampton State Training School in April, 1967. The record of his behavior at Hampton and whether he was released or simply escaped is barren, but it is known that he left Hampton in April of 1968, at age sixteen. Ms. Barron's prediction of a "powderkeg" seems to have been quite accurate.

B. *History of Suggs from May, 1968, Through Pleas of Guilty Before Justice Nunez*

1. The Charges and Psychiatric Examination by Dr. Messinger.

On May 6, 1968, Suggs was arrested for feloniously assaulting a patrolman on the City College campus, where appellee may have taught karate.[8] Shortly thereafter he was charged with numerous rapes and robberies allegedly committed in April and May of 1968.[9] Because he was under nine-

---

7. The interviewer noted that Suggs was an aggressive, verbal adolescent who superficially "appears quite intact. However, there is a deep underlying sense of hopelessness in the boy. His HX [history] gives him every reason to feel what he does." The diagnostician observed that "the boy is beginning to utilize projective defense [sic] which increases [sic] rage & serve him no purpose" and that "his thinking can become rather confused," but he as yet did "not see him as a psychotic young-

ster." The doctor warned, however, that "[t]here is a strong possibility . . . that he may develop into a paranoid schiz. [sic] in the future."

8. Subsequently, Suggs consistently claimed that the patrolman had been abusive to him.

9. One indictment charged Suggs in 18 counts with rape, sodomy, robbery and related crimes committed against three women on April 27,

teen years of age—he reached seventeen in June of 1968—appellee was entitled to consideration for youthful offender treatment. The chief probation officer, Mr. Reeves, requested a prepleading psychiatric examination,[10] which was a fairly routine practice at that time in youthful offender cases. Suggs was examined first by a psychologist,[11] then by Dr. Messinger, a psychiatrist, at the Supreme Court Psychiatric Clinic on July 17, 1968, to assist the court in deciding whether youthful offender treatment was appropriate.[12]

The psychological report is important since it was the basis for much of the subsequent psychiatric report of Dr. Messinger, the discovery of which caused our court to remand the previous grant of the writ in this case. This report explains that Suggs "answers or not as he happens to feel at the moment, & refuses such tasks as he wishes. Much of the time he was angry and complaining, reciting various grievances, etc. He sat with his back turned to Ex. [examiner] for part of the time." Evidently his "variable cooperation" made for "extreme swings" on the psychological tests which ranged from "defective to superior." The psychologist thought that Suggs had "an intellectual potential well above average, but he has never submitted to the discipline of learning, so that he reads and spells at approximately a third grade level." Despite Suggs' lack of cooperation on most of the Rorschach tests, Suggs "demonstrat-

ed that he is able to function very well when he is so inclined." The psychologist concluded that "such projective material as we have, does not suggest a true thinking disorder, nor a psychosis. He impresses as willful, defensive, hostile, negativistic, paranoid, & anti-social. We would classify him as a narcissistic [sic] behavior disorder [13] of extreme degree, a poor prognosis is quite likely." (Emphasis in original.)

A clinical history sheet evidently prepared by Dr. Messinger on July 17, 1968, shows only superficial mention of Suggs' prior unusual behavior. It refers to his stays at Wiltwyck and Warwick. Beyond this, little psychiatric information is revealed by the history. It indicates that Suggs complained of " 'black-outs.' " It also quotes him as saying that "[p]eople yell all the time." Suggs' inability to distinguish truth from fantasy is highlighted by much of the information he provided.[14] Suggs was initially diagnosed "Without Psychosis, but pathologic, emotionally unstable, with depressive and paranoid trends."

On July 23, 1968, Dr. Messinger, who evidently had before him none of Suggs' psychiatric histories compiled at other institutions, submitted a formal report to the Supreme Court of the State of New York, indicating "that [Suggs] is without psychosis and of average intelligence." The next four paragraphs discuss the psychological tests, mentioning appellee's composite I.Q. of 95, and quote the psychological report.

May 22, and May 24, 1968. A second indictment charged him in five counts with robbery and related crimes committed against two women on April 30 and May 28, 1968. Thus, there was a total of 23 counts pending against him.

10. It is unclear whether the examination was conducted solely with reference to the assault charge or was ordered in light of the subsequent rape and robbery charges as well. In any event, the psychiatric examinations were conducted after the rape and robbery indictments were handed down, and the reports show an awareness of these additional charges.

11. Mr. Reeves informed the director of the psychiatric clinic that Suggs "expressed a great deal of hostility and aggressivity toward authority figures and it would seem that he has many emotional problems." He also noted that

Suggs had threatened to kill a police officer during the interview.

12. Suggs was subsequently denied youthful offender treatment by Justice Tierney on July 31, 1968.

13. Dr. Augustus F. Kinzel later testified in the federal habeas evidentiary hearing, on January 21, 1977, that there is no such "known entity in psychology or in psychiatry."

14. For example, the history sheet states that appellee attended high school through the eleventh grade, that he played basketball and the trumpet, that he sang "lead soprano" at Hampton, and that his real father gave him money. It is apparent from subsequent psychiatric histories that these facts are probably untrue.

Dr. Messinger's own observations were as follows:

> At interview defendant displays a restless, truculent attitude as he tries to justify his habitual and extreme maladjustment on the conditions under which he was born and raised. He expresses violent antipathies towards his sister and his father, as well as all authority and parental surrogate figures. Review of his past shows that from his earliest years he has been indolent, rebellious, and intolerant of any restraint or restriction. He gets into fights both in and out of institutions and says, "I don't need friends. If I make friends sooner or later they are my enemies."
>
> Defendant's personality classification seems best described as that of the Pathologic Personality Group. Emotionally Unstable Type, with depressive and paranoid trends.[15]

The court's copy of this report apparently went astray. It was not in the court file at the time of the plea proceedings before Justice Nunez. Its existence did not become known until April 1, 1975, when it was discovered by an Assistant Attorney General while the first appeal to this court from Judge Duffy's initial issuance of the writ was pending.

### 2. Purported Suicide Attempt.

Following Dr. Messinger's examination on approximately July 26, 1968, Suggs was sent to the Brooklyn House of Detention for Men. On August 1, 1968, he was placed under special mental health observation due to a "self-inflicted injury" and an undated letter from Suggs suggesting the possibility of suicide.[16]

According to Warren A. King, the psychiatric social worker who conducted the mental health evaluation, Suggs told him that Suggs had attempted to hang himself to "retaliate against parents because they refused to write or visit." King noted in his report that before the transfer, he had warned the correction officers that "this inmate could possibly be assaultive." He stressed that Suggs had a "long history of acting out behavior and resulting institutionalization" and "is quite disturbed, and has a great deal of underlying hostility." This incident apparently was not known to Suggs' counsel or to any judge before whom appellee appeared until the hearing before Judge Duffy in January, 1977.

### 3. The Plea of Guilty Before Justice Nunez.

On September 13, 1968, Suggs, accompanied by his Legal Aid lawyer, Donald Tucker, pleaded guilty before Justice Nunez to one count each of rape in the first degree and of robbery in the first degree in satisfaction of all counts of the indictments. It is on this date that appellee's competency is in question. According to Mr. Tucker, Suggs came out of his cell on September 13 demanding to plead guilty to the charges

---

**15.** Dr. Kinzel, at the federal habeas evidentiary hearing, criticized this report:

[An]other concern I had about the report, is that it is not a psychiatric examination. It has a review of the psychological tests. It has some comments on his current mental state, as he observes him, but there is no history here, and a psychiatric examination basically has to have a history of present illness, of past illness, family illness, childhood history. It has to have some current observation of the recent mental state and the current and the recent behavior, and then some diagnosis based on those findings.

Really what this is is more of a rather cursory description of part of the present mental state. In other words, it is not what one would generally consider a complete psychiatric examination.

It must further be stressed that this report did not address the issue of appellee's competence to be tried. At the hearing before Justice Melia it was characterized by Justice Nunez, who presided at Suggs' plea proceeding, as "only a preliminary report," relating to the propriety of Youthful Offender treatment. *See* II, B, 3, *infra.*

**16.** The letter stated:

Dear Mr. Officer's
if you was me what will you do if you knew you was facing a life time Sentence, Plus you don't have no one Visiting you or Writing you What Will you do. So I feel my best way out is a Easy Way. I Will not tell you What my Easy Way is but you soon find out.

and fully admitting his guilt as to all of them. Suggs signed a statement to that effect for Mr. Tucker.

Prior to accepting the pleas an extensive colloquy was held between Suggs and Justice Nunez, which was alluded to at length both by Justice Melia in the subsequent state court evidentiary hearing and by Judge Duffy in his opinions. Suggs related some of his family and school history, and in the process stated that he had been examined at the psychiatric clinic "right downstairs."[17] In response to the court's questions, Suggs described one rape incident and one robbery. Asked the reason why he attacked the rape victim, he said, "I just had it in mind." When asked why he threatened another woman and stole her purse, Suggs replied, "I just wanted to steal it."

During the course of the colloquy, Suggs answered affirmatively questions concerning the voluntariness of his plea,[18] subsequently mandated by *Boykin v. Alabama*,[19] *supra*. Immediately before accepting the pleas the following conversation occurred:

The Court: You are not sorry at all that you did any of these things, Mr. Suggs?

The Defendant: Nothing to be sorry about.

The Court: What?

The Defendant: There is nothing to be sorry about.

The Court: Nothing to be sorry about? Well, what in your opinion would be something to be sorry about? If you did what? If what happened?

The Defendant: If I did something and I did it there is nothing to be sorry about after I do it.

The Court: No matter what you do?

The Defendant: No matter what I do.

Plea Minutes at 17–18, *People v. Suggs*, Nos. 3063–68, 3063A–68 (N.Y.County Sup. Ct., Sept. 13, 1968) (hereinafter Plea Minutes). Justice Nunez then accepted the pleas, but continued to question Suggs further on his lack of remorse. It is at this critical point in the record that the case takes on its full ramifications:

The Court: Well, now, Mr. Suggs, you know that you are going to be punished for these crimes, do you not?

The Defendant: Yes, sir.

The Court: Well, don't you think it might help you if you show that you are sorry, you show some compassion for your victims?

The Defendant: I tried that once.

The Court: What?

The Defendant: I tried that once.

The Court: You tried that once? When was that?

The Defendant: When I was small.

The Court: What happened when you were small?

The Defendant: I lost a finger because I tried.

The Court: You lost a finger, you say?

The Defendant: Part of it.

The Court: What happened then?

The Defendant: That's when I did something when I had a fight with my sister. I wanted to show my mother I was sorry. Instead of showing her I was sorry, she cut me.

The Court: Who tried to cut you, your mother or your sister?

---

**17.** Justice Nunez then asked the court clerk whether Suggs had undergone a psychiatric examination. The clerk responded that there was no such record in the file.

**18.** Thus he said that he had consulted with his counsel, had heard the facts of the case as related to the court by the district attorney and that his guilty pleas were voluntary and not due to threats or promises.

The district court has suggested that the colloquy did not sufficiently apprise Suggs of the consequences of his plea, since there was no discussion of the specific constitutional rights waived by a plea of guilty, the potential maximum sentence Suggs might have to serve or the possible minimum sentence that would have to be served prior to parole. 390 F.Supp. at 386. It is unnecessary, however, to rule on this matter in resolving the issues on appeal.

**19.** Rule 11 of the Federal Rules of Criminal Procedure governs such questioning in the federal courts. *See* Note, *Rule 11 and Collateral Attack on Guilty Pleas*, 86 Yale L.J. 1395 (1977) [hereinafter Note, *Collateral Attack*].

The Defendant: My mother.

*Id.* at 19–20.

Whether it was the description of the incident of his mother's cutting off his finger—something which was untrue from other past histories, *see* note 5, *supra* —Suggs' lack of remorse, or his general demeanor, something rang a bell with Justice Nunez. He immediately said: "Set it down for investigation and sentence October 31st. I want a complete psychiatric examination and report on this boy. And for that purpose I wish to commit him on my motion to Bellevue Hospital for examination and report." *Id.* at 20. Justice Nunez then explained to appellee: "We are going to have the doctors look at you, Mr. Suggs. They may be able to help you in some way because there is something wrong with you, apparently. You seem to be—whom are you mad at?" The defendant answered, "No one." The court responded: "All right, see you on the 31st. Try to cooperate with the doctors. See if they can help you." *Id.* at 21.

Years later, at the state evidentiary hearing, Justice Nunez, who recalled the Suggs case due to appellee's "unexpected responses," testified by stipulation that he had ordered the Bellevue examination not just as an aid in sentencing but "for all purposes, including a determination of whether defendant was competent to be tried."[20] He also testified that even had he been aware of Dr. Messinger's report of July 23, 1968, he still might have ordered the Bellevue examination since

[t]he defendant's answers were unusual. The Messinger report was only a preliminary report because the Psychiatric Clinic does not have the time or the facilities to make the kind of complete examination that can be done at Bellevue Hospital. [It] said that the defendant was without psychosis and did not speak to the issue of whether he was competent to be tried.

C. *The Psychiatric Examinations After the Plea: The Lubin and Kadar Reports*

A psychiatric caseworker at Bellevue, Mr. Jacoby, interviewed Suggs four days after his plea, on September 17, 1968. His records evidence appellee's highly disturbed state,[21] noting that Suggs was sullen, somewhat withdrawn, and extremely infantile. Suggs avoided all eye contact and showed no emotion or guilt while relating the facts surrounding the alleged crimes he committed. "His underlinging *[sic]* hostility, confusion, desorganization *[sic]* was manifest throught *[sic]* the course of [the] interview." His "poor judgment and inability to control agressive *[sic]* impulses were evidential *[sic]* . . . ."

Two days later, six days after the reference to Bellevue by Justice Nunez, Suggs was examined by Dr. Lubin, chief psychiatrist at the Bellevue Prison Ward, who without any knowledge of the Messinger report, of Suggs' medical history in the Rockland State Hospital records or of Suggs' suicide attempt six weeks before in August, 1968, still concluded that Suggs was incompetent. His tentative diagnosis from this first interview characterized

---

**20.** The State argues that the psychiatric examination was "in aid of sentencing," as indicated in the court's docket entry. Thus, they contend, Suggs' commitment to Bellevue following his plea was not an indication that Justice Nunez, the defense or the prosecution thought that Suggs was incompetent. Rather, the State argues, had anyone considered Suggs incompetent, the judge would not have permitted entry of the guilty pleas. Appellee argues that the plea minutes as well as Justice Nunez' testimony clearly show that Justice Nunez ordered the examination to determine whether Suggs was competent to be tried. Suggs explains that Justice Nunez did not set aside the plea after

ordering the psychiatric examination so that a new plea would not have to be entered if Suggs subsequently were declared competent.

**21.** Suggs rambled on about his past history, often making little sense and inventing stories. He nonchalantly offered information concerning a murder which he said he had committed, explained that the current charges were the result of a misidentification and that he didn't trust his lawyer, characterized himself as a drug dealer, and requested that his mother (probably meaning his aunt unless he was under a delusion) help him this time, as she had not done so before.

Suggs' mental condition as "schizoid with paranoid features." [22] Dr. Lubin viewed Suggs as a young sullen boy who "sees circtumstances *[sic]* around him [in] a badly distorted fashion." [23] It appeared to him that "petulance and anger" played a role in Suggs' decision to plead guilty. He concluded by noting that appellee could be competent with the help of vigorous defense counsel.[24] He later elaborated on this notation at the hearing before Justice Melia, indicating that while Suggs was then incompetent to stand trial, he could perhaps be "assisted to a state of cooperation where he might then be considered competent" through the "vigorous assistance" of his attorney.

A second preliminary report date September 25, 1968, confirmed the doctor's earlier diagnosis.[25] The doctor's impression was schizophrenia, paranoid type. Again, Dr. Lubin noted that Suggs views the world in "a totally distorted fashion, such that even the most innocuous stimuli lead to believed persecution." He found extant paranoid delusions reflected in Suggs' extreme suspiciousness, negativism, inability to communicate meaningfully and his predisposition to violence, as well as Suggs' rationalizations for the numerous rapes.

Dr. Lubin, in conjunction with Dr. Kadar, made a third examination of Suggs on October 21, 1968, resulting in a final report to the court which, in large part, summarizes the two preliminary reports. They first discuss appellee's history of behavior problems and prior treatment in various reformatory institutions. They note that while Suggs was claiming innocence at Bellevue, his "ancillary history seems to indicate that he actually made specific and detailed admissions of [his criminal acts] and in a manner to communicate [to the court] that these activities were based on bizarre motivations and were possibly a function of mental disorder." The report concludes that Suggs sees things in a "totally distorted fashion," has the psychosis of "schizophrenia, paranoid type," and is "in such a state of insanity as to be incapable of understanding the charge, proceedings, or making his defense." [26]

### D. *Judicial Determination of Incompetency*

On November 6, 1968, Suggs was returned to court with the Lubin-Kadar report. The case came before Justice Gold

**22.** He subsequently explained at the state evidentiary hearing before Justice Melia that such a diagnosis indicates incompetency.

**23.** Suggs this time claimed innocence to the rape and robbery charges not on misidentification grounds, as he had told the caseworker, but because the police had arrested him in revenge for the assault he allegedly committed on the *police officer at City College.* He said that he pleaded guilty on Mr. Tucker's advice that this was his best chance of minimizing the sentence. Mr. Tucker, however, testified at the federal hearing that Suggs had insisted on pleading guilty. *See* note 46 & accompanying text *infra.*

**24.** This conclusion may have been based on his observation that in periods of lucidity appellee could adequately describe the details of the crimes with which he was charged. Dr. Lubin questioned, however, whether Suggs could be made to understand that he actually would have to face these charges. This prompted him to visit Mr. Tucker, the Legal Aid attorney, who thought that Suggs' criminal activities were the means by which he could strike back at society. Mr. Tucker told Dr. Lubin that the court felt the violent acts were retaliatory,

probably the result of delusions of persecution. Mr. Tucker informed the doctor that before Justice Nunez, Suggs had given a detailed account of the crimes, contrary to his claims of innocence made while at Bellevue. The attorney also revealed that Suggs had told the court that the rapes were in response to a rape of his sister years earlier. We note that the July, 1968, Messinger report indicates that Suggs had "violent antipathies toward his sister."

**25.** In finding appellee incompetent to stand trial, Dr. Lubin at this time considered and rejected the possibility that Suggs was feigning incompetency.

**26.** The New York statutory test of incompetency to stand trial was then whether the defendant is in "such state of idiocy, imbecility or insanity as to be incapable of understanding the charges against him or the proceedings or of making his defense . . . ." N.Y.Code of Crim.Proc. § 662–b(1) (McKinney Supp.1970). The current version, N.Y.Crim.Proc.Law § 730.-10 (McKinney Supp.1976), became effective September 1, 1971.

rather than Justice Nunez. Although Justice Gold has no recent recollection of the proceeding, as he testified by stipulation in the federal evidentiary hearing below, the minutes indicate that the district attorney chose to "confirm" the report and waive a hearing.[27] Justice Gold declared Suggs incompetent to stand trial and committed him to the custody of the Commissioner of Mental Hygiene.

### E. The Sojourn at Matteawan

On November 15, 1968, the Commissioner committed Suggs to Matteawan, a state hospital for the criminally insane. A tentative diagnosis on November 15, 1968, confirmed Dr. Lubin's findings. Suggs was characterized as a schizophrenic, paranoid type. His behavior at Matteawan continued to exhibit delusional thinking. On admission he was "distant, dull, tense, hostile," with a "tendency to ramble." He said that many of his statements at Bellevue were "lies," made to feign mental illness so that he would be sent to a hospital. Yet the Bellevue records reveal that he protested at being hospitalized. He claimed that he had lied about having hallucinations, but shortly thereafter he demanded his own room, fearful that someone might attack him. He also boasted of having made a lot of money, of his father's having deposited $5,000 for him when he was born and of his mother's having left him $17,000. He would admit and then later deny that he had committed the rapes and robberies.

Subsequently, with the use of the drug Librium, he became "no management problem," his behavior now "childish and silly." He continued to assert that he had put on an act at Bellevue in order to be sent to the hospital, while expressing anger toward his lawyer who "had sent him to a hospital in order to get rid of him." He complained of a frameup, and each time he was seen offered different information as to his income and bank accounts. Matteawan came to the conclusion as of December 18, 1968, that

he had a psychosis with a history of long-standing maladjustment and antisocial activities, that he was never able to form close relationships and that he showed suicidal and homicidal tendencies. The staff diagnosis was "Psychosis with Antisocial Personality, Paranoid and Reactive Features."

An "auto-anamnesis" or history of Suggs conducted on January 17, 1968, revealed additional "fanciful" and "extraordinary" stories. Appellee explained that he had never worked (though he had earlier stated that he earned hundreds of dollars each week as a musician and karate teacher) because his father sent him money to make up for turning Suggs' mother into an alcoholic, thereby causing her death. Suggs earlier had told Justice Nunez that he had not heard from his father for many years. Plea Minutes at 9. Suggs also revealed that he had taken out a "contract" on his father's life, and that he had admitted committing the offenses to "get off the streets" and to avoid a contract the Mafia had out on him. His birthdate had now become 1947 instead of 1951; hence he claimed to be twenty-one rather than the seventeen indicated in prior medical records. He also stated that he had been married for "quite some time," and got along "very well" with his wife and child. Letters written to his "wife" as well as to his aunt were not answered.

On January 25, after having been off medication for fifteen days, Suggs was assaulted when he made sarcastic, racial remarks to other patients. More significant is Suggs' statement to a doctor on February 22 that though there had been something wrong with him when he arrived, he now felt that he was well. He explained: "I convinced myself that I did something that I didn't do it." The doctor noted that "[h]e was referring to pleading guilty to his indictment." When asked if he knew that he was convicted he said, "I don't [sic] know my original charge was murder and they changed [sic] to statutory rape."

---

27. The district court at one point erroneously believed that a hearing had been conducted. 390 F.Supp. at 386.

On March 18, 1969, Suggs, seen in special consultation by two doctors, "tried to confuse the issue about his age," stated that he had lied to the doctors in Bellevue when he told them that he did not understand the charges, and emphasized that he had money in the bank from dealing in drugs. He repeatedly referred to being arrested on a charge of murder, claiming his innocence, and discussed the fight at City College with the police officer who, he said, kicked him in the groin after telling him to stand against the wall. Suggs, after being read a letter by the district attorney which indicated that he was not charged with murder, said "I have tried to go to a real hospital · because I know I do have problems." The doctors concluded that his mental condition had improved but that he remains "immature, insecure and unstable" with a "tendency to explosive reactions on slight provocation" and that "[o]n the ward he is considered very excitable and unpredictable."

On April 1, 1969, he was seen again by the same two doctors who found him more composed. He had now made up his mind to return to court to face criminal charges against him, although he was then claiming that he did not commit the crimes for which he had been indicted. He still insisted that he had money in the bank—this time $25,000 which he inherited from his mother.

The Matteawan superintendent certified Suggs as competent on April 4, 1969. A letter to the court said that after Suggs' admission he had shown continued symptoms of mental illness. Under treatment with "psychotropic" drugs, his mental condition had gradually improved to the point where, unlike a few months earlier, he was able to give a coherent and relevant account of the events leading to his arrest. The diagnosis remained "Psychosis with Antisocial Personality, Paranoid and Reactive Features."

### F. Competency Certification and the Second Messinger Report

Suggs was certified as competent on the basis of the Matteawan reports by Justice Schweitzer on April 9, 1969. He was reexamined pursuant to a special court order of April 30, 1969, by Dr. Messinger. The latter's one-page report on May 20, 1969, referred to his first examination in July, 1968, when the doctor "did not find [Suggs] psychotic, but considered him to be a case of severe sociopathic personality disorder." Dr. Messinger now found Suggs "calm, cooperative, cool and calculating," and "oriented in all spheres . . . [with] an excellent memory both for recent and remote events." He also found that Suggs "denies any delusions or hallucinations, and carefully considers the various alternatives open to him in facing his current charges." Dr. Messinger again diagnosed him "as being of the Pathologic Personality Group, Emotionally Unstable Type, with paranoid and depressive tendencies."

### G. The June 6, 1969, Sentencing

Suggs appeared with newly appointed counsel, Mr. Tobin, before Justice Schweitzer on June 6, 1969. The court clerk declared the proceeding an "arraign[ment] . . . for sentence on your plea of guilty" to the crimes of rape and robbery, each in the first degree. When asked by the clerk whether Suggs could show legal cause why judgment should not be pronounced against him, he replied in the affirmative, saying: "Judge, at that time I wasn't capable of understanding the case."

The sentencing minutes reveal that his attorney had received an adjournment sometime earlier to formalize an application to withdraw the pleas of guilty. However, two days before the June 6 proceeding Mr. Tobin had informed Justice Schweitzer that Suggs did not want to withdraw his plea and was willing to accept sentence. Suggs was then interrogated at the proceeding on whether he wished to be "sentenced today" or to have an adjournment of his sentence to confer further with his attorney about withdrawing his guilty pleas. He wished "to be sentenced today," not to withdraw his pleas of guilty and not to have an adjournment.

He was sentenced, based on his guilty pleas of September 13, 1968, after a plea for

leniency by counsel, to five to fifteen years' imprisonment on each of the two counts, the sentences to run concurrently. He is still serving these sentences in the New York prison system. In the sentencing colloquy before Justice Schweitzer, none of the questions on voluntariness, factual basis for the pleas, or comprehension of waiver of rights, required by *Boykin v. Alabama, supra,* and *United States ex rel. Dunn v. Casscles,* 494 F.2d 397 (2d Cir. 1974), was asked.

### H. Postconviction Relief

#### 1. Grant of Habeas Corpus Relief.

It is unnecessary to recount all of the state and federal proceedings taken on Suggs' behalf after sentencing. They are set forth in the opinions of Judge Duffy [28] and of this court.[29] Suffice it to say that following Suggs' various unsuccessful challenges to his conviction in state appellate and postconviction proceedings, on February 25, 1975, Judge Duffy granted habeas relief without holding a hearing, 390 F.Supp. 383. He found the guilty pleas entered before Justice Nunez on September 13, 1968, void under *McCarthy v. United States, supra,* and *Pate v. Robinson, supra,* because entered when Suggs was incompetent.[30] He further determined that the sentencing before Justice Schweitzer was not a valid substitute for the void guilty pleas because the state court did not conduct an inquiry into whether Suggs' previous void plea (or his decision not to withdraw it) was voluntary, as required by *Boykin v. Alabama, supra;* nor was inquiry made into the factual basis of the pleas, as mandated by *United States ex rel. Dunn v. Casscles, supra.*[31] The district court also rejected the State's arguments that Suggs' decision not to withdraw his plea at sentencing effected a ratification of the prior invalid pleas or a waiver of his objection to their invalidity.

#### 2. Discovery of Dr. Messinger's Reports and the Remand for an Evidentiary Hearing.

During the pendency of the State's appeal from Judge Duffy's order, the two Messinger reports were discovered. This court remanded the case for an evidentiary hearing on the issue of Suggs' competency at plea in view of the issue of fact raised by the contradictory conclusions reached in the Messinger and Lubin-Kadar reports.[32] 523 F.2d at 542–43. Whether the evidentiary hearing was to be held by the state or

**28.** 390 F.Supp. 383; 400 F.Supp. 1366 (S.D.N.Y.1975); 422 F.Supp. 1042 (S.D.N.Y.1976); 430 F.Supp. 877 (S.D.N.Y.1977).

**29.** *United States ex rel. Suggs v. LaVallee,* 523 F.2d 539 (2d Cir. 1975).

**30.** In so holding, the district court relied on the judicial determination of incompetency rendered by Justice Gold on November 6, 1968, Suggs' subsequent commitment to Matteawan, the October 21, 1968, report of Drs. Lubin and Kadar which concluded that Suggs was incompetent, and Suggs' "bizarre" responses during the plea colloquy with Justice Nunez on September 13, 1968.

**31.** Contrary to the requirement of an affirmative showing on the record of an explicit waiver of constitutional rights, *see* text at III, B, 1–2, *infra,* the district court found:

> Inspection of the sentencing minutes reveals a complete absence of any meaningful inquiry into the voluntariness of petitioner's earlier plea. The sentencing court's sole inquiry was directed to the question of whether petitioner wished to withdraw his earlier plea. Upon the defendant's acquiescence in the earlier plea, the court proceeded without any further inquiry of its own into the original plea's voluntariness or the voluntariness of a now-competent defendant's ratification of a plea made when he was incompetent. No inquiry whatever was made of petitioner at any time during which he was competent as to whether any promises had been made to him, whether he had been coerced, whether he was acting under his own free will either with respect to his invalid plea or his decision not to withdraw it.

> Moreover, no inquiry was made of the defendant, now that he was competent, as to whether there was a proper factual basis for his plea. *United States ex rel. Dunn v. Casscles,* 494 F.2d 397 (2d Cir. 1974); *McCarthy v. United States, supra.*

390 F.Supp. at 388–89.

**32.** We did not consider the district court's rulings rejecting the State's contentions that Suggs had ratified his earlier pleas or waived objections to them by failing to withdraw the pleas when given the opportunity to do so by the sentencing court. 523 F.2d at 542 n.1.

district court was left to the discretion of Judge Duffy. *Id.* at 543.[33]

Judge Duffy ordered a state hearing. He reasoned: "Since the necessary witnesses will include Justices of the [State] Supreme Court [including Justices Nunez, Sandifer[34] and Gold], the proper forum for taking their testimony would be the Supreme Court of the State of New York." 400 F.Supp. at 1367.

3. The State Evidentiary Hearing on Competency.

Pursuant to Judge Duffy's order, on November 17 and December 1, 1975, a hearing was held before Justice Melia, who assumed that he was to hold, and did hold, a full-fledged evidentiary hearing on the issue of Suggs' competency at plea.[35] Counsel for Suggs called Drs. Lubin and Kadar, who testified on their reports;[36] Justice Nunez, who testified by stipulation that he had ordered Suggs sent to Bellevue for "all purposes" including competency, and that he probably would have ordered a more complete examination had he known of the first Dr. Messinger report, *see* II, B, 3, *supra;* and Justice Sandifer, who testified by stipulation that he had no knowledge of the first Messinger report when he rendered his decision on December 6, 1973. *See* note 34 *supra.* For the State, Suggs' lawyer, Mr. Tucker, testified that at the time of the September 13, 1968, pleas, he thought Suggs competent, but had he known of the Messinger report he would have requested an additional psychiatric examination before allowing Suggs to plead. The assistant district attorney testified that nothing during the plea colloquy made him think Suggs incompetent. And Dr. Messinger testified as to his July, 1968, and May, 1969, reports and the July, 1968, psychologist's report on which the doctor had relied.[37] Justice Gold did not testify.

---

**33.** We had in mind two competing interests: "the congressional policy of requiring exhaustion of available state remedies" and "the equally important policy of not exhausting state prisoners who seek to assert their federal constitutional rights." *Id.* at 543. This court was under the mistaken impression due to an omission in the record, *see* notes 42–43 & accompanying text *infra,* that appellee might not have exhausted his state remedies.

**34.** On December 6, 1973, Justice Sandifer had rejected Suggs' argument made on a motion to vacate judgment that the sentencing court was required to inquire into the voluntariness of Suggs' pleas. *People v. Suggs,* Nos. 3063/68, 3063A/68, 2251/68 (N.Y.County Sup.Ct., filed Dec. 6, 1973). Leave to appeal was denied on March 5, 1974.

**35.** The district court, in its November 16 opinion, explained that it had requested the state court merely to take testimony and to make narrow "findings concerning knowledge of the existence of the Messinger reports." 422 F.Supp. at 1043. This construction of the order is consistent with Judge Duffy's specific request that the state court ascertain whether enumerated judges and attorneys were aware of the Messinger reports. 400 F.Supp. at 1367. According to Judge Duffy, the state court's determination that Suggs was competent "went far beyond this narrow matter referred for resolution." 422 F.Supp. at 1044–45.

The State argues that the order did not impose limits on the state court's decisionmaking function. Because the district court suggested witnesses to be called, sanctioned the examination of other witnesses not designated by the court, allegedly urged the parties to present all available evidence to the state court, and made the reference in response to the opinion of this court, which had ordered a full evidentiary hearing on the issue of Suggs' competency at plea, appellant contends that Judge Duffy did request a hearing on and a determination of the issue of Suggs' competency at plea.

**36.** Both doctors reaffirmed their conclusions of incompetency and explained the factors which led to their conclusions. Dr. Kadar testified that he did not recall having previously seen the July 23 Messinger report. He could not give an opinion as to its accuracy because he could not form an opinion either way on Suggs' competency at any time prior to his examination of Suggs.

Dr. Lubin testified that while he found Suggs incompetent to stand trial from the first interview on September 19, 1968, onward, he could not say definitively that Suggs was incompetent on the day of his plea.

**37.** Dr. Messinger explained that although the psychologist had found appellee uncooperative much of the time, "it was a willful type of negativism that led him to not cooperate in parts of the testing." The doctor also noted that Suggs was more cooperative during Dr. Messinger's examination of Suggs. He clarified his July 23, 1968, diagnosis of Suggs to mean a "sociopathic personality" which is considered competent according to "general psy-

Justice Melia, in an opinion dated December 3, 1975, found that Suggs was competent on September 13, 1968, when he pleaded guilty before Justice Nunez. *People v. Suggs, supra,* Nos. 3063/68, 3063A/68, 2251/68, at 29. He relied on the extensive plea colloquy [38] as well as the tactical considerations underlying the plea bargain [39] as clear evidence that Suggs "knew where he was and what he was doing" in pleading guilty on September 13. *Id.* at 17. He also considered it significant that Suggs was represented by an "extremely able and experienced attorney," *id.* at 18, who "found no reason, either prior to or during plea, to lead him to believe that the defendant was incompetent [although] counsel did agree with Judge Nunez that an examination would be desirable as an aid in imposing sentence." *Id.* at 29. No mention was made of Tucker's testimony that he would have requested an examination had he been aware of Dr. Messinger's July 23, 1968, report.

Similarly, Justice Melia concluded that Justice Nunez could not have considered Suggs incompetent: "Certainly an able and experienced jurist such as Judge Nunez did not then believe the defendant to be incompetent else he would not have accepted the plea." *Id.* The court noted that "psychiatric examinations are often made after a guilty plea and prior to sentence as an aid and guide to the court in the imposition of sentence." *Id.* at 5. Justice Melia did not discuss either Justice Nunez' testimony that he had ordered the Bellevue examination for all purposes including a determination of competency, or the plea minutes containing Suggs' story about his mother's cutting off his finger, which prompted Justice Nunez to order the psychiatric examination. Nor did he find controlling Justice Gold's subsequent November 6, 1968, finding of incompetency.[40]

And he relied on Dr. Messinger's testimony, which "seemed . . . to be highly credible and reliable. The testimony of Drs. Kadar and Lubin was not as impres-

---

chiatric definition." Although Suggs was "paranoid," he had not lost contact with reality to such an extent that he was psychotic. Since the doctor did not detect any "divorce from reality," he found Suggs competent.

He explained further that appellee was not under constant observation at the time of his examination, unlike the procedure at Bellevue. Thus the doctor might not have been aware of "short psychotic episodes" or other unusual behavior. Dr. Messinger did not consider his diagnosis inconsistent with the other reports finding Suggs psychotic and incompetent, because his finding of competency on July 23, 1968, did not necessarily mean that Suggs was competent on September 13, 1968; "people who are found competent on one day can become psychotic or incompetent at another time . . . ."

38. The court stated:
 [T]he minutes of plea reflect no impairment of memory. He answered questions covering many aspects of his life from birth to date of arrest and even recalled Dr. Messinger's examination some six weeks prior to plea. He recalled the crimes to which he pleaded and volunteered information in connection therewith. He demonstrated a capacity to exercise judgment. He was able to assess the ages of two of his victims. His answers were responsive, relevant, and illuminating.

*People v. Suggs,* Nos. 3063/68, 3063A/68, 2251/68, at 29 (N.Y.County Sup.Ct., filed Dec. 3, 1975).

39. Justice Melia noted:
 The defendant faced multiple count indictments embracing many unrelated crimes . . . . Would not competent judgment dictate the acceptance of the best offer in order to avoid convictions on multiple counts with the added impact of the court having heard live testimony of victims?
 *Id.* at 18.

40. Justice Melia stated:
 The District Court, in its opinion herein in 390 F.Supp. 383 at p. 389, said, "It is manifest that where a defendant has been remanded for a competency examination immediately after pleading guilty, and is subsequently found incompetent to stand trial, such a plea *must* be considered null and void . . . ."
 I respectfully submit that that is neither true as a matter of fact nor law. Indeed the psychiatrists, Drs. Kadar and Lubin, called by the defense here, concede that the defendant could very well have been competent on September 13 when he entered his plea. And Dr. Messinger who found him to be competent on July 23, 1968 conceded that the defendant could have been incompetent on 9/13/68.
 *Id.* at 17 (emphasis in original).

sive." *Id.* at 28. Yet Dr. Messinger's July, 1968, report was subject to certain shortcomings revealed by Justice Nunez, *see* note 15 *supra,* II, B, 3, *supra,* and subsequently by Dr. Kinzel. *See* notes 13–15 & accompanying text *supra.* Moreover, the doctor had no recollection of "the person,' John Suggs, personally," at the time of his testimony before Justice Melia.[41] Furthermore, the interviews with Dr. Lubin began only six days after the plea proceeding and involved a more extensive psychiatric examination than that performed by Dr. Messinger.

Finally, Justice Melia went one step beyond even a broad interpretation of Judge Duffy's order—that an evidentiary hearing on competency be conducted. *See* note 35 *supra.* He held that assuming Suggs' incompetency at plea, the latter ratified his pleas of guilty at the June 6, 1969, sentencing hearing. This matter had previously been disposed of to the contrary by Judge Duffy. 390 F.Supp. 383, 388–89.

### 4. Judge Duffy Orders a Federal Evidentiary Hearing.

On November 16, 1976, Judge Duffy ordered a federal evidentiary hearing on the issue of Suggs' competency at plea. 422 F.Supp. 1042. Initially, he dismissed the State's argument that Suggs' relief lay in appealing Justice Melia's decision in the state courts on two grounds: (1) Suggs had already presented his claim of incompetency to the state courts in a second coram nobis

petition[42] that had been omitted from the record on the first appeal to this court;[43] and (2) Judge Duffy had referred the matter to the state court "out of respect for the convenience of the Justices in the State system, whose testimony was essential," not out of exhaustion considerations. 422 F.Supp. at 1044.

The district court then offered three principal reasons why Suggs was entitled to a federal evidentiary hearing. First, Judge Duffy said that he had remanded the case to the state court "for the mere taking of testimony to determine whether those involved with the case had knowledge of the Messinger reports," and that the findings of competency and ratification exceeded the scope of his order. *Id.* at 1044–45; *see* note 35 *supra.* Second, the district court found certain assumptions underlying Justice Melia's determination of competency contradicted by the record.[44] 422 F.Supp. at 1045. Third, Judge Duffy determined that the merits of the factual dispute were not fully developed in the state hearing, 28 U.S.C. § 2254(d)(1), pointing out the "glaring omission" in not taking the testimony of Justice Gold who had declared Suggs incompetent after the plea proceeding. *Id.*

### 5. The Federal Competency Hearing.

A hearing on Suggs' competency was held on January 17 and 21, 1977. The transcript and exhibits from the state hearing were introduced as well as significant new

---

41. This lack of recognition does not seem remarkable, given the large number of people Dr. Messinger was examining in 1968. However, Dr. Kinzel subsequently testified in the federal evidentiary hearing that he found Dr. Messinger's memory loss revelatory of the cursory nature of the examination since a thorough psychiatric examination brings out individual histories that awaken the psychiatrist's recollection.

42. The State does not dispute this on appeal.

43. The district court's holding answered the query posed by this court in the prior appeal, 523 F.2d at 543, as to whether the incompeten-

cy issue had ever been raised in the state courts. *See* note 33 *supra.*

44. The state court's conclusion that the examination ordered by Justice Nunez was for sentencing purposes only, contrary to Justice Nunez' own testimony, was given as one example. Justice Melia also improperly believed that Judge Duffy in his earlier opinion had found Suggs' behavior bizarre at the plea colloquy because of appellee's lack of remorse. 390 F.Supp. at 386. Judge Duffy, however, was referring to Suggs' *reasons* for not being sorry. This distinction was critical due to psychiatric testimony before Justice Melia to the effect that competent defendants often exhibit lack of remorse for their acts.

evidence not before the state court.[45] Suggs' entire file from Matteawan, which contained records of his prior hospitalization at Rockland State Hospital, his files from the New York City Department of Correction, his complete 1968 file from the Bellevue Psychiatric Clinic, and his file from the Legal Aid Society were all admitted. A representative of the New York City Department of Correction testified to Suggs' suicide attempt in August of 1968, which, it will be recalled, occurred one week after the first Messinger report was prepared. In addition, Mr. Tucker's testimony revealed that there was something unusual about Suggs' behavior on September 13, 1968, in that Suggs had consistently denied his guilt until the day of his pleas when he became "adamant" and "demanded" to plead guilty.[46]

By far the most illuminating testimony was that of Dr. Augustus F. Kinzel, appointed by the district court. A psychiatrist of impressive credentials,[47] his testimony was heavily relied upon by Judge Duffy in reaching his determination that Suggs was incompetent at the time of his September, 1968, pleas. While a full reading of the doctor's extensive testimony is necessary to appreciate why it was given so much weight, suffice it to say that Dr. Kinzel thoroughly studied all available data on the issue. Based upon various prior medical records[48] unavailable either to Drs. Messinger, Lubin or Kadar, the minutes of the guilty pleas, as well as Dr. Kinzel's exami-

nation of Suggs held on January 12, 1977,[49] it was the doctor's opinion that Suggs was suffering from paranoid schizophrenia on September 13, 1968, not merely from a personality disturbance. He disagreed with Dr. Messinger's July, 1968, report which he criticized as the product of an incomplete psychiatric examination, see note 15 supra, in that it gave no medical or childhood history or details of past illness, and appeared to be a "cursory description of part of [Suggs'] present mental state." He believed that the symptoms Suggs displayed to the many examiners were signs of psychotic illness. Even the psychologist's report on which most of Dr. Messinger's report was based described symptoms of paranoid schizophrenia, rather than of a mere personality disorder, which is probably what the psychologist meant by his diagnosis. See note 13 & accompanying text supra. He also questioned the validity of the psychological tests because Suggs had not cooperated.

Dr. Kinzel was aware of Suggs' detention house suicide attempt in August, 1968, a few weeks prior to his plea, a fact unknown to the other psychiatrists who had testified before Justice Melia. He reflected that this was only one incident of a "past history of suicidal behavior of a serious kind . . ." In reference to the plea minutes, Dr. Kinzel not only noted the bizarre finger amputation testimony, terming it a "confabula-

---

**45.** It was stipulated that Justice Gold had no recollection of any proceeding concerning Suggs.

**46.** Mr. Tucker, in order to protect himself, had asked Suggs to sign a statement admitting his guilt. The statement was in the Legal Aid file.

**47.** He had been a staff psychiatrist with the United States Medical Center for Federal Prisoners in Springfield, Missouri, had taught Psychiatry and the Law at Columbia Law School, had authored numerous articles, and was then an associate in clinical psychiatry at Columbia University.

**48.** Two of those records are particularly noteworthy. He reviewed the records from Rockland State Hospital, where Suggs had been admitted at twelve years of age, noting that

Suggs already was forming "false beliefs" of dangers to himself which were inaccurate.

Dr. Kinzel's review of the Bellevue records from July and August of 1965 indicated that the psychiatrists there "felt that [Suggs] was suffering from more than simply a social . . . or . . . conduct disturbance; that he had symptoms . . . which were suggestive but not conclusive of paranoid schizophrenia."

**49.** The doctor was much impressed by Suggs' then existing "major memory deficit" of events occurring from the time he was at Hampton until sometime after he arrived at Matteawan. He discounted the possibility of feigning, and explained in detail why he "strongly" felt that Suggs' memory loss was caused by a psychotic disorder. He terms the condition "psychotic amnesia."

tion," [50] without "relevance to the issue at hand," but also was impressed by Suggs' "psychotic lack of judgment" as evidenced by his failure to verbalize any motivation or make any attempt to defend his acts. In the doctor's opinion, Suggs "had no serious awareness that he was being charged with very serious things that he should defend himself with." As to Suggs' ability to describe the criminal acts at plea, the doctor said that psychotics can account literally for their conduct without understanding why they did it, whether they should have done it and whether they should explain it. Counsel's lack of awareness was readily explicable since laymen are not easily able to recognize such a psychosis. Suggs' insistence on pleading is evidently common among psychotic defendants.

Dr. Kinzel agreed with the Lubin-Kadar diagnosis as well as the initial diagnosis at Matteawan. He stressed that Suggs' resulting incompetency was a result of a long-lasting psychosis, not episodic in nature, noting that it is very unusual for a patient to be competent one day and incompetent the next.[51] He also felt that even though it was eight years after the fact, given all the history, which even this lengthy exegesis has only touched upon, he could apply basic principles of psychiatry to arrive at his conclusion, with which "few psychiatrists would disagree," that Suggs was psychotic when he entered the pleas and probably was then incompetent to stand trial.

Judge Duffy held, for the second time, on April 5, 1977, that Suggs was incompetent on September 13, 1968. He recounted much of the evidence which we have discussed and then concluded:

> Weighing all the evidence, the conclusion is inescapable that petitioner was incompetent on September 13, 1968. Al-

though Dr. Messinger indicated that petitioner was competent on July 23, 1968, that report was prepared some seven weeks before the pleas were entered, and as reflected in the May 20, 1969 report, Dr. Messinger acknowledged petitioner's psychotic condition which prompted the Matteawan commitment. He also conceded the possibility that petitioner may have been experiencing a psychotic episode even at the time the July [1968] examination was being conducted. The only other indicia of competence is Mr. Tucker's testimony and, although an attorney's opinion as to his client's ability to understand the nature of the proceedings and to cooperate in his defense is significant, *United States ex rel. Roth v. Zelker,* 455 F.2d 1105, 1108 (2d Cir.), *cert. denied,* 408 U.S. 927, 92 S.Ct. 2512, 33 L.Ed.2d 340 . . . (1972), it is by no means controlling, especially in light of Justice Nunez's observation and reaction with which, based on my reading of the plea minutes, I agree. Dr. Kinzel's testimony relating to the account of petitioner's loss of a portion of his finger, and the indications that the finger was crushed and then amputated, rather than chopped off by Suggs' mother, as recalled by petitioner, bolsters my conclusion in this regard.

> Furthermore, the above, coupled with the fact that petitioner was found to be incompetent by Dr. Lubin only six days after the plea, which conclusion was confirmed and corroborated by Dr. Kadar some four weeks later, and that on the basis of the Lubin-Kadar report, without objection by the respondent, petitioner was committed to Matteawan [by Justice Gold], substantially negates any other conclusion but that petitioner was indeed incompetent at the time of the pleas.

---

**50.** According to Dr. Kinzel, a confabulation is an erroneous or loose association which is a classic sign of psychosis or thinking disorder common among schizophrenics.

**51.** The doctor did not find Suggs "actively psychotic" at the moment, but appellee still exhibited the "basic and latent signs of schizophrenia." The doctor felt that though there were signs of the "psychotic aspect" of Suggs' ill-

ness early on, he "really lost touch with reality in a meaningful way" when he was at Hampton in the latter part of 1967. This "psychotic state" continued through late winter or early spring, 1969, while at Matteawan, and corresponded to the period of time about which Suggs currently could remember little. *See* note 49 *supra.*

430 F.Supp. at 883–84. He vacated the guilty pleas on the basis of *McCarthy v. United States, supra,* and *Pate v. Robinson, supra,* since they were null and void because taken while incompetent; implicitly adopted the conclusions of his first opinion, 390 F.Supp. 383, which rejected the State's waiver and ratification arguments; and issued the writ of habeas corpus unless Suggs was permitted to replead within 60 days.[52]

### III. DISCUSSION OF THE LAW

A. *Effect of Justice Melia's Decision on Competency*

■ The State argues that Judge Duffy erred in "entirely disregarding" the state court's determination that Suggs was competent when he pleaded guilty, a determination reached after what the State claims was "a full evidentiary hearing," and "amply support[ed]" by the record. Brief for Appellant at 34–35. Principles of comity

and federalism, we need not be reminded, require us to accord "great weight," *id.* at 36, to a state court's factual findings, made after a full and fair hearing. *LaVallee v. Delle Rose,* 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 675 (1973) (per curiam); *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Jennings v. Casscles,* No. 77–2064, 568 F.2d 229, 232 & n. 1 (2d Cir. 1977); 28 U.S.C. § 2254(d).[53]

The State's position may be broken down into four contentions. First, the State asserts that it was "contrary to principles of federalism and comity" to ask the state court merely to take testimony and make findings on whether certain key individuals had knowledge of the Messinger reports without requesting that the competency issue be resolved as well. Brief for Appellant at 37–38. Thus, the argument continues, while the district court itself had the option of holding an evidentiary hearing on competency or of allowing the state court

---

**52.** Based upon Suggs' history and the letters he wrote to the district court indicating fear for his life and a belief of persecution, Judge Duffy recommended another examination of Suggs' current mental competency prior to new plea proceedings.

**53.** Section 2254(d) provides:

In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

28 U.S.C. § 2254(d).

to do so, the "narrow" limits which the district court said it had imposed on the state court's decisionmaking function, *see* note 35 *supra,* are impermissible. Second, the State urges that the limits specified by Judge Duffy, 422 F.Supp. at 1044–45, were an afterthought because the referral was not so limited. *See* note 35 *supra.* Third, the State argues that Suggs not only made no objection to the state court's deciding the issue of competency, but "vigorously" litigated the question. Finally, the State contends that the district court's conclusion, 422 F.Supp. at 1045, that the merits of the factual dispute were not fully resolved, 28 U.S.C. § 2254(d)(1), because Justice Gold did not testify, *see* II, H, 4, *supra,* was erroneous.

We need not settle the knotty issues raised by the State.[54] In our view, whether Justice Melia's findings were supported by the evidence was sufficiently doubtful to justify ordering a further evidentiary hearing in the district court's discretion under 28 U.S.C. § 2254(d)(8). Moreover, there were material facts inadequately developed at the state court hearing. 28 U.S.C. § 2254(d)(3).

1. Lack of Evidence.

We have previously noted Justice Melia's finding that Justice Nunez could not have believed Suggs incompetent, "else he would not have accepted the plea." *People v. Suggs, supra,* Nos. 3063/68, 3063A/68, 2251/68, at 29. Justice Melia, however, did not discuss (1) the factual or the legal impact of the colloquy concerning Suggs' mother cutting off his finger that prompted Justice Nunez on his own motion to order a psychiatric report, (2) Justice Nunez' testimony that he filed such an order to deter-

mine whether Suggs was competent to be tried, or (3) Justice Nunez' explicit recognition in the plea minutes that "[the doctors] may be able to help [Suggs] . . . because there is something wrong . . ., apparently." Plea Minutes at 21. In addition, Justice Melia's conclusion that the plea minutes revealed no impairment of capacity to exercise judgment or unusual behavior flies in the face of the impressions drawn by Justice Nunez, who was obviously in a better position to evaluate Suggs' demeanor at the time of the pleas. Justice Melia's omission to analyze this evidence was sufficient, in and of itself, to raise subsection (8) doubt whether the state court finding of competency was supported by the evidence.

Justice Melia's conclusion that Justice Nunez would not have accepted Suggs' plea if he did not believe Suggs to be competent is defective for another reason. If, as Justice Nunez testified, Suggs' commitment was "for all purposes," his acceptance of the plea was necessarily conditional, that is, subject to the condition subsequent of a finding of competency. And Justice Gold's subsequent finding of incompetency to stand trial (acquiesced in by the State) obviously related back to the date of the pleas. The finding was a judicial determination that Suggs had been incompetent at least since the day he was committed by Justice Nunez for psychiatric examination. As Judge Duffy stated:

> Such a psychiatric report, and its subsequent ratification by the court, attesting to a defendant's incompetency, must be interpreted as conclusively invalidating any plea that constitutes a voluntary relinquishment of rights made at a time when a defendant is suffering under such a disability.

---

54. We note, however, that the presumption of correctness afforded state court factual determinations rendered after a hearing on the merits has traditionally applied to determinations made while the case is before the state courts in the first instance in deference to the state's criminal justice system. In contrast, the hearing before Justice Melia was not an original state court trial, appeal or coram nobis proceeding. Rather, it was in response to a reference by the federal habeas court specifically

directed to the newly discovered Messinger reports. Judge Duffy chose to refer the matter to the state court, notwithstanding his right to hold the hearing himself, for the convenience of the state judges who would be required to testify. Certainly different considerations from those underlying the restraint principles of § 2254(d) arise when the district court has the power to determine the issue, yet refrains from doing so.

390 F.Supp. at 387 (citations omitted). *See Saddler v. United States,* 531 F.2d 83, 84 (2d Cir. 1976) (per curiam) (retrospective examination into defendant's mental competency three years earlier at plea granted on appeal from denial of 28 U.S.C. § 2255 petition); *cf. People v. Hudson,* 19 N.Y.2d 137, 278 N.Y.S.2d 593, 225 N.E.2d 193 (1967) (remanding after verdict, pursuant to the dictates of then recently decided *Pate v. Robinson, supra,* for an evidentiary hearing on defendant's competency at the time of trial, without the need to conduct a new trial on guilt or innocence if defendant is found to have been competent), *cert. denied,* 398 U.S. 944, 90 S.Ct. 1852, 26 L.Ed.2d 281 (1970). Thus Justice Gold's commitment order conclusively invalidated the pleas. Yet Justice Melia attached little or no importance to Justice Gold's determination. *See* note 40 *supra.*

Justice Melia made other findings that were also directly contradicted by the record. While noting the importance of Mr. Tucker's view that Suggs was not incompetent, Justice Melia disregarded Tucker's testimony that he would have requested a psychiatric examination before allowing Suggs to plead had he known of the Messinger report.[55] Justice Melia also found Dr. Messinger's testimony more "credible" and "reliable" than that of Drs. Lubin and Kadar. Yet Dr. Lubin's first diagnosis was prepared only six days after the plea in question, and Dr. Messinger conceded the possibility that Suggs' condition could have deteriorated during the seven weeks between his examination and the day of the plea proceeding. Furthermore, all doctors agreed that Drs. Lubin and Kadar had performed a more thorough examination than did Dr. Messinger. A copy of the Messinger report was not even ordered by the state courts to determine Suggs' competency to stand trial. Moreover, Dr. Messinger acknowledged that Suggs could have been

experiencing psychotic episodes during the July, 1968, examination. The doctor further revealed that he would not have been aware of this mental state unless manifested in aggressive or other behavior that would have put the prison authorities on notice because unlike Bellevue, which provided continuous observation, the Supreme Court Psychiatric Clinic operated on an outpatient basis. Finally, Justice Melia accorded no weight to the Matteawan reports rendered after Suggs' commitment by Justice Gold, which substantially corroborated the findings of Drs. Lubin and Kadar.

As stated in *Townsend v. Sain, supra,* 372 U.S. at 316, 83 S.Ct. at 759 (citations omitted):

> This Court has consistently held that state factual determinations not fairly supported by the record cannot be conclusive of federal rights. . . . Where the fundamental liberties of the person are claimed to have been infringed, we carefully scrutinize the state-court record.

We have before us just such a case.

2. Material Facts Inadequately Developed.

██ Beyond the lack of evidence sufficient to support the state court findings, several material facts were not adequately developed at the state hearing. Therefore, under 28 U.S.C. § 2254(d)(3) Judge Duffy was entitled to reconsider the issue of competency. The suicide attempt at the Brooklyn House of Detention, the apparent suicide note and the correction officers' observation as reported in their records were not before the state court. These events were highly relevant since they occurred after Dr. Messinger's report of July 23, 1968, and prior to the pleas before Justice Nunez in early September, and since they directly reflected upon Suggs' mental condition, his

---

**55.** It was subsequently revealed at the federal hearing that although copies of prepleading psychiatric reports in aid of youthful offender determinations were not usually sent to defense counsel, consent of the defendant and his attorney was a prerequisite to conducting such an examination. Nothing in the record indicates that such a procedure was followed prior to the July, 1968, Messinger examination.

judgment and his rationality.[56] In addition, the state court was not aware of Suggs' Matteawan file which contained his early medical history from Rockland State Hospital. These records shed light on the developmental aspects of Suggs' mental condition, revealing the complexity and depth of Suggs' emotional problems.

Moreover, no psychiatrist at the state hearing had sufficient information to give an accurate opinion of Suggs' competence on the date of the pleas in question. However, Dr. Kinzel, at the federal hearing, could and did focus on appellee's mental state as of September 13, 1968. With the aid of all prior institutional and medical records, most of which had never been seen by the other doctors, Dr. Kinzel clarified an aspect of the plea colloquy which apparently had troubled Justice Melia. He explained that appellee's lucid description of the details of his crimes did not necessarily indicate competency because psychotics commonly can account for their conduct without comprehending its significance. Justice Melia, without the guidance of psychiatric testimony on this point, had relied heavily on Suggs' descriptions of the crimes in concluding that Suggs was competent. But the United States Supreme Court has explained that

> it is not enough . . . that "the defendant [is] oriented to time and place

and [has] some recollection of events," . . . the "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." [57]

*Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960).

Finally, after having been given an opportunity to review the Legal Aid files in the federal hearing, Mr. Tucker offered additional, important information. He testified that Suggs had exhibited unusual behavior on the day of his plea when Suggs demanded to plead guilty, though he had previously consistently asserted his innocence.

**3. Conclusion: No Abuse of Discretion.**

■ Considering the record as a whole and the important evidence unavailable to the state court, it cannot be said that Judge Duffy abused his discretion. We think that under §§ 2254(d)(3) and (d)(8) he was entitled to hold a separate hearing. That Judge Duffy could have held the hearing in the first instance, *see* note 54 *supra,* fortifies our view that his independent examination of the evidence was proper.[58]

---

**56.** A serious suicide attempt reflects irrational thinking of considerable significance, as Dr. Kinzel testified, especially in light of Suggs' past suicidal, depressive behavior.

**57.** For a discussion of the purposes behind the requirement that defendants be competent to stand trial, see Note, *Incompetency to Stand Trial,* 81 Harv.L.Rev. 454, 457–61 (1967).

**58.** The State does not challenge the correctness of the district court's finding that Suggs was incompetent at the time of his pleas before Justice Nunez. This conclusion seems almost inevitable given the record of previous proceedings before Judge Duffy, the first reasonably complete psychiatric record and the testimony of the first psychiatrist who had that complete psychiatric record available to him. If the judge can be faulted at all it is that he, like so many other courts before him, including the state court here, did not limit psychiatric testimony to psychiatric findings. He also permitted psychiatric experts to express the legal conclusions to be drawn from those findings. *See* J. Katz, The Psychiatrist in Court—Expert or Advocate?, Jan. 12, 1970, at 6–10 (unpublished paper presented at St. Louis University, on file at Yale University); Blinder, *Why It's Crazy for a Psychiatrist to Talk About Insanity,* 23 Cath.U.L.Rev. 769, 772–73 (1974); *cf. United States v. Brawner,* 153 U.S.App.D.C. 1, 42–43, 47–53, 471 F.2d 969, 1010–11, 1015–21 (1972) (en banc) (Bazelon, *J.,* concurring and dissenting) (insanity a legal conclusion on which psychiatrists should not testify).

However, the Federal Rules of Evidence permit experts to testify on the ultimate issue for factual resolution. Fed.R.Evid. 704. Moreover, the State, which had previously asked the other psychiatrists for their ultimate legal conclusions on competency, did not object to Dr. Kinzel's testimony.

## B. Waiver and Ratification at the June Sentencing

The questions we did not reach on the former appeal but discussed by Judge Duffy below in his earlier opinion, 390 F.Supp. 383 (S.D.N.Y.1975), are now unavoidably before this court. The first question is whether, for purposes of federal habeas corpus relief, Suggs waived his claim of incompetency at the time of the pleas by not adequately asserting it at the June 6, 1969, sentencing proceeding. The second is whether he ratified the previous pleas of guilty, accepted after a *Boykin v. Alabama*[59] colloquy conducted while Suggs was incompetent, by not withdrawing his pleas when given the opportunity by the sentencing court. That Suggs neither waived nor ratified could be inferred from his sentencing statement, made to Justice Schweitzer: "Judge, at that time I wasn't capable of understanding the case." The fact is, however, that subsequently the sentencing court gave him the opportunity to withdraw his guilty pleas and with counsel present he did not do so. *See* II, G, *supra*.

### 1. Waiver.

■ The State relies upon *Wainwright v. Sykes, supra,* and *Fay v. Noia,* 372 U.S. 391, 439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), for the proposition that because Suggs did not, at the sentencing proceeding, adequately assert[60] the claim that he was incompetent at the time he pleaded guilty, he is precluded from later so asserting in a habeas corpus proceeding. Thus, the State argues, Judge Duffy erred in even considering the competency issue. While this argument has initial appeal, careful scrutiny reveals its deficiencies on the facts of this case.

Suggs has claimed throughout these habeas proceedings that he was denied due process by the sentencing court's failure to inquire into the voluntariness of his guilty pleas, as required by *Boykin v. Alabama, supra,* in light of Justice Gold's finding that Suggs was incompetent at the time of his pleas before Justice Nunez. To evaluate the validity of the sentencing proceeding, a secondary inquiry into Suggs' competency at plea is necessary, since this was the only time at which a *Boykin* colloquy occurred. *Pate v. Robinson, supra,* and *McCarthy v. United States, supra,* teach us that a guilty plea made while a defendant is incompetent violates due process and is therefore void. It logically follows that any *Boykin* discussion occurring while a defendant is incompetent is also a nullity. Thus, if Suggs had been competent at plea, there would have been no need to conduct a *Boykin* colloquy at sentencing; for Suggs would have been informed of his *Boykin* rights at a time when he could have understood and intelligently waived them. Conversely, a determination of incompetency would entitle Suggs to a *Boykin* colloquy at the time of sentencing, unless his failure to withdraw his guilty plea after informing the court that he might have been incompetent on September 13, 1968, constituted a waiver of this right.

*Boykin v. Alabama, supra,* imposes an affirmative duty on the trial judge to conduct, sua sponte, an on the record examination of the accused to ascertain that he fully understands the consequences of a guilty plea: "[A] waiver of [the] . . . important federal rights [protected by *Boykin* will not be presumed] from a silent record." 395 U.S. at 243, 89 S.Ct. at 1712 (footnote omitted). *See* 1 C. Wright, *Federal Practice and Procedure* § 172, at 365, supp. at 107 (1969 & 1976 Supp.). Thus, a defendant cannot waive his right to attack a conviction rendered without the *Boykin* safeguards simply because he did not inform the trial judge of the judge's failure

---

**59.** 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

**60.** In view of our disposition of the State's waiver claim, it is unnecessary to determine whether Suggs' brief mention of his possible incompetency, coupled with his subsequent decision not to move to withdraw his pleas *see* II,

G, *supra*, constituted a sufficient objection to preclude application of waiver principles. For purposes of this appeal, without deciding the question, we will assume that he did not adequately raise the issue of incompetency at plea before Justice Schweitzer.

to discharge his duties at the time the error was committed.[61] The accused does not bear the burden of insuring that his plea is voluntary; that onus rests on the court.

Applying these principles to the facts at hand is a relatively simple matter. Because of the peculiar facts of this case, the sentencing court was obligated to inquire into Suggs' competency at plea to determine the necessity of conducting a second *Boykin* colloquy. Suggs had no obligation to apprise Justice Schweitzer of the court's responsibility to comply with *Boykin's* dictates. It is undisputed that Suggs could have successfully withdrawn his prior pleas on the ground of incompetence. However, we cannot accept the proposition that his omission to do so somehow nullified his ability later to contest a *different constitutional deprivation* in a *different proceeding*.[62] Such a conclusion would lead to the nonsensical result that, while a defendant ordinarily does not have to raise a *Boykin* error at the time of its commission (here, at the sentencing proceeding) if an evaluation of this claim subsequently reveals the need to consider another constitutional deprivation made at an earlier time (here, conducting plea proceedings while Suggs was incompetent), the defendant's failure to assert the related secondary error at a time when he was not required to apprise the court of the primary *Boykin* claim would result in a forfeiture of his right to assert both errors. Suggs' incompetence at the time he pleaded was of no consequence to him until Justice Schweitzer

failed to conduct a *Boykin* colloquy. Because Suggs was not then obligated to request a colloquy in order to seek habeas relief in the future, it is manifest that he was not required to assert any connected underlying claims of error until he timely raised the *Boykin* issue.

Subsequent to the sentencing proceeding, Suggs presented his *Boykin* claim to the state courts without success.[63] In rejecting this claim, Justice Sandifer did not rely on any failure on Suggs' part to raise the *Boykin* issue at an appropriate time under New York law. Having exhausted his state remedies, he was entitled to pursue the issue in the federal habeas proceeding before Judge Duffy. *See Allen v. County Court*, No. 77–2059, 568 F.2d 998, 1001–1004 (2d Cir. 1977). Therefore *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976), and *Wainwright v. Sykes, supra,* are inapposite. At no time did Suggs fail to raise the *Boykin* issue when required to do so by either state or federal law. *Fay v. Noia, supra,* to the extent, if any, that it survives *Wainwright, see* Cover & Aleinikoff, *Dialectical Federalism: Habeas Corpus and the Court,* 86 Yale L.J. 1035, 1069–77, 1100–02 (1977), certainly does not add weight to the State's contention of waiver. Here there was no bypass of state proceedings, deliberate or otherwise.

Nor do we find convincing the argument that because the *Boykin* colloquy

---

**61.** *Cf.* Note, *Collateral Attack, supra* note 19, at 1396, 1413–14 & n. 68 (highlighting sparsity of precedent and inappropriateness of precluding post-conviction attacks on guilty pleas on waiver grounds where a defendant fails to reveal the involuntary nature of his plea to the trial judge at the time of the Rule 11 inquiry).

**62.** Because we focus on Suggs' objection to the failure of the sentencing judge to make *Boykin* inquiries, rather than on Suggs' failure to object before the sentencing court to the previous invalid pleas, it is unnecessary to consider whether federal habeas review is foreclosed when a defendant does not timely raise a general incompetency claim in the state courts. *Cf. United States ex rel. Callahan v. Follette,* 418 F.2d 903 (2d Cir. 1969) (denial of a state

prisoner's petition for federal habeas relief alleging that his guilty plea was invalid because of a sentence promise upheld on waiver grounds due to his failure to file a written motion to withdraw the plea though given an opportunity to do so by the sentencing judge after the promise was called to the judge's attention and sentence was imposed), *cert. denied,* 400 U.S. 840, 91 S.Ct. 80, 27 L.Ed.2d 74 (1970). We note, however, that a claim of legal incompetence to stand trial may be raised in a collateral proceeding under 28 U.S.C. § 2255, without having previously raised the issue on appeal. *E. g., Newfield v. United States,* 565 F.2d 203, 207 (2d Cir. 1977).

**63.** *See* note 34 *supra.*

normally occurs at plea proceedings, Justice Schweitzer was unaware of the need to conduct a second *Boykin* colloquy without Suggs' informing him of his claims of incompetence and of concomitant invalid pleas before Justice Nunez. Suggs told the court that he felt he had been incompetent. Moreover, Justice Schweitzer had the record before him. It revealed not only Justice Nunez' order committing Suggs to Bellevue because, to paraphrase Justice Nunez, something was wrong with Suggs, but also Justice Gold's determination of incompetency based on the examination ordered by Justice Nunez. This record certainly should have alerted Justice Schweitzer to his duty to determine the voluntariness of the pleas. *Cf. Saddler v. United States, supra,* 531 F.2d at 87 (evidence of mental incompetency presented to the sentencing court but not before the court at plea sufficient "flurry of warning flags" to alert the sentencing judge to the possibility that defendant may have been incompetent to plead, thus requiring a mental examination and a hearing on competency).

2. Ratification.

 The argument that Suggs ratified his previous void pleas by failing to withdraw them at the sentencing proceeding stands on no higher footing than the State's waiver claim. *Boykin v. Alabama, supra,* establishes that a trial judge may not accept a guilty plea "without an affirmative showing [on the record] that it was intelligent and voluntary." 395 U.S. at 242, 89 S.Ct. at 1711. And *United States ex rel. Dunn v. Casscles, supra,* mandates an inquiry into the factual basis underlying the plea. Here, the sentencing minutes are de-void of any inquiry into either the voluntariness or the factual basis of Suggs' earlier pleas; the only colloquy at sentence focused on the nonwithdrawal of the previous void plea. Suggs was not, therefore, adequately informed of "the alternative courses of action open to" him at a time when he was competent. *North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (citing, *inter alia, Boykin v. Alabama, supra* ). *Cf. United States v. Journet,* 544 F.2d 633, 636 (2d Cir. 1976) (federal requirements under Rule 11, strictly enforced on direct criminal appeal); *but cf. Del Vecchio v. United States,* 556 F.2d 106, 110–11 (2d Cir. 1977) (defendant must show prejudice affecting fairness of proceedings or voluntariness of the plea to succeed in a collateral attack based on a Rule 11 violation); *Kloner v. United States,* 535 F.2d 730, 733–34 (2d Cir.) (not every right waived must be enumerated pursuant to Rule 11), *cert. denied,* 429 U.S. 942, 97 S.Ct. 361, 50 L.Ed.2d 312 (1976).

The State argues, however, that by failing to withdraw his invalid pleas at sentencing, Suggs ratified them at a time when he was competent,[64] and that the inquiry conducted by Justice Nunez was accordingly revivified at this later time. We disagree. If Suggs did not have the capacity to stand trial or to plead guilty[65] on September 13, 1968, he hardly could have then comprehended the waiver of his *Boykin* -protected constitutional rights to a trial by a jury of his peers, to confrontation of witnesses, and to a privilege against compulsory self-incrimination, 395 U.S. at 243, 89 S.Ct. 1709. Thus, there was no prior "voluntary and intelligent" waiver of these rights which Suggs ratified at the sentenc-

---

**64.** Suggs had pursued the claim in the state and federal courts that he was also incompetent at time of sentence without success.

**65.** It has been held that competency to plead guilty must be greater than competency to stand trial since the former requires an understanding of constitutional rights. *E. g., Sieling v. Eyman,* 478 F.2d 211 (9th Cir. 1973). This conclusion was based on the holding in *Westbrook v. Arizona,* 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966) (per curiam), which recognized a distinction between competence to stand trial and competence to waive the right to counsel, the former nor necessarily guaranteeing the latter. We need not reach this question, however, since the parties have not objected to the use of the New York statutory test of incompetency to stand trial, *see* note 26 *supra,* throughout these proceedings to determine Suggs' competency to plead guilty. Moreover, it may be drawing too fine a line to be susceptible of scientific evaluation. *See* Note, *Competence to Plead Guilty: A New Standard,* 1974 Duke L.J. 149, 170.

ing proceeding. Because of appellee's incompetence, it is as if the *Boykin* colloquy before Justice Nunez never occurred. *See McCarthy v. United States, supra; Pate v. Robinson, supra.* Accordingly, there was never a plea of guilty when Suggs was (a) competent and (b) informed of his *Boykin* rights. Judge Duffy well stated our view:

> [S]hould the trial court . . . wish to provide a newly-competent defendant an opportunity to ratify his earlier [void] plea, a full and complete inquiry must be made by the court on that later occasion to determine the voluntariness of that ratification, the voluntariness of the plea itself, and further inquiry must once again be made of the now-competent defendant as to whether there is a proper factual basis for the plea.

390 F.Supp. at 389.

### C. *Future State Proceedings*

We endorse Judge Duffy's suggestion, 430 F.Supp. at 884, that, in view of certain paranoidal letters he received from Suggs in March of 1977, appellee be re-examined for competency before repleading. *See* note 52 *supra.* If Suggs is found to be incompetent, as appears likely given his longstanding mental illness, now possibly exacerbated by almost ten years behind bars, then the state mental health authorities are, of course, authorized to take whatever measures are appropriate under Article 730 of the Criminal Procedure Law or Article 31 of the Mental Hygiene Law.

Judgment affirmed.

IRVING R. KAUFMAN, Chief Judge (concurring):

I concur in Judge Oakes's meticulous and well-reasoned opinion. I would merely add that his painstaking exposition of the unfortunate details of Suggs's "coming of age" points to an emerging and highly significant problem in the law, namely, the troubled relationship between the vagaries of psychiatric evaluation and the difficulties of judicial determinations of incompetence. At the time of Suggs's plea, before one could be deemed incompetent to stand trial in New York, a judicial finding was required that he was in "such [a] state of idiocy, imbecility or insanity as to be incapable of understanding the charges against him or the proceedings, or of making his defense . . . ." New York Code of Crim.Proc. § 662–b(1) (McKinney Supp. 1970).

Of course, psychiatrists are invariably enlisted to aid in such determinations. Yet, psychiatry is at best an inexact science, if, indeed, it is a science, lacking the coherent set of proven underlying values necessary for ultimate decisions on knowledge or competence. It is suited, as it should be, to the diagnoses of illness or maladjustment for the purposes of treatment. Judges, on the other hand, while provided with a set of determinate values through the development of legal principles, simply lack the expertise to apply meaningful standards in individual cases. And, unfortunately, because of the imprecision of the norms in this area, much is lost in the translation from psychiatrist to judge or jury, between diagnosis and decision. This problem is even more striking where an individual is found not guilty by reason of insanity. There, the absence of a coherent psychiatric notion of volition and of workable legal standards results, it has been repeatedly claimed, in the administration of ad hoc justice.

Throughout his tortuous ten year history in the courts and in the psychiatric clinics, John Suggs was—and still is—a victim of our inability to deal adequately with this dilemma. It is clear from the record that his behavior is bizarre and destructive, and that he has never had much more than a tenuous grasp on reality. Perhaps Dr. Messinger's assessment of his condition as "emotionally unstable, with depressive and paranoid trends" is correct; perhaps Dr. Lubin's diagnosis of his condition of "schizophrenia" is more accurate. Fortunately, we need not reassess the medical testimony. Judge Duffy, who considered Suggs's complete psychiatric history for the first time, was clearly correct in his decision to redetermine the issue of Suggs's competence at plea, and his findings have ample support in the record. Yet, one cannot help but have the gnawing uncertainty, in deciding after ten years that civil commitment proceed-

ings might be appropriate, whether both judges and psychiatrists have led Suggs on a long day's journey into night.